Lora Reinbold
17217 Yellowstone Dr
Eagle River, Ak 99577
aklora@outlook.com
907 301-7711



RECEIVED

SEP 20 2023

CLERK, U.S. DISTRICT COURT
ANCHORAGE, AK

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| LORA H. REINBOLD,<br>PLANTIFF,<br><br>v<br><br>ALASKA AIRLINES, KYLE LEVINE,<br>KIM HUTCHINSON, JEREMY HORN<br>DIANE BIRKETT RAKOW, MARILYN<br>ROMANO, TROY MICHAEL WUYTS<br>SMITH, AMBER ALLEN, M. FRIAS,<br>JOHN ROSS MANN, KRISTEN DILLEY,<br>BRENDA BAYNARD,<br>ALISON REINECCIUS,<br>DOROTHY DANIELS, TIM THOMPSON<br>LAUREL CARMICHAEL<br>    DEFENDANTS. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.3:23CV-00087 JMK<br><br>SECOND AMENDED COMPLAINT<br><br><br>Honorable Judge Josh Kindred<br>United States District Court Judge |

## Plaintiff's Second Amended Complaint

### I. INTRODUCTION

1. From 2013-2019, Plaintiff, Lora H. Reinbold ("Lora") served in the House of

   Representatives and then served as an elected Senator for District G in the

   Alaska State Senate from 2019-2023. During much of this time, she

   maintained an MVP Gold member status with Alaska Airlines, Inc.

(Defendant "Alaska Airlines"). Flying on Alaska Airlines was the only reasonable way to travel to the Capital, because Alaska Airlines was the sole commercial provider during legislatives sessions, offering flights between Anchorage, Lora's hometown, and Juneau, Alaska's Capital. Having access on Alaska Airlines flights was crucial and the only reasonable travel option.

2. As a representative of nearly 40,000 constituents, Lora had a heightened and unique constitutional duty, unlike the general public, to be in Juneau during session to tend to her official duties, which included proposing amendments, listening to public testimony, engage in debates, gaining support on her legislative positions, and voting on critical legislation amongst other responsibilities.

3. The Alaska Constitution mandates legislators to be present in Juneau for session. If absent, the Alaska State Troopers can be dispatched to locate them if a "call" is placed on the House. The importance of reliable air travel for Alaskans, especially legislators frequently commuting to Juneau, cannot be understated.

4. On April 22, 2021, Lora was unjustly banned from flying on all Alaska Airlines flights, based on an unspecified alleged violation of a mask policy. Notably, no prior warnings were given during the flight, no yellow card

(exhibit A) was issued, and Alaska Airlines did not contact Lora prior to instituting the travel ban. Although Lora had a qualified mask exemption, and was always willing and prepared to present it, Alaska Airlines consistently refused to recognize this exemption, asserting that no mask exemptions were permissible.

5. The nearly year-long ban, deprived Lora of due process and subjected her to a deluge of negative media coverage, locally, nationally, and internationally. The undue, impermissible, and unlawful ban gravely impeded her ability to tend to some important legislative responsibilities, especially during a period marked by *four* special sessions, in addition to the regular and extended legislative session.

6. The widespread worldwide negative media attention surrounding the ban led to Lora having a significantly damaged public reputation. The ban restricted her mobility even in case of family emergencies, Lora felt isolated in Juneau. Additionally, Lora missed multiple opportunities to serve her constituents due to the illegitimate extended flight ban. Lora was compelled to take highly inconvenient and dangerous alternative routes:

a. Driving from Anchorage for 750 miles, including through Canada, to get to Haines, then catching a 5-hour ferry. The ferry ran on a very sporadic, limited and undependable schedule.

b. Flying 4 hours to Seattle on a different airline, then an estimated 5-hour drive to Bellingham. Lora then had to wait to take the bi-monthly, 3.5-day ferry to Juneau from Bellingham. Even after careful coordination, these commutes could easily require a 5-day trek to get to or from Juneau to Anchorage.

7. Those options were totally unworkable during session. The other long route options pre/post session, significantly increased risks to her health and safety, during the extensive travel ban. Being forced to travel in harsh winter conditions on unmaintained roads severely increased life-threatening safety risks to both Lora and her spouse in particular in January 2022, where temperatures were -40 and they drove in blizzard conditions, on icy roads thru Alaska and Canada, for days. There were no other options to get to Juneau for the 2022 legislative session, for there was only one ferry between Haines and Juneau in January 2022.

8. Alaska Airlines enjoys a monopoly between Anchorage and Juneau during legislative session. Defendants' banishment process was accomplished

behind closed doors, based on unverifiable or refutable, anonymous, and potentially false alleged complaints of Plaintiff's "repeated non-compliance" with Alaska Air's mask policy coupled with Governor Dunleavy's mask mandate (exhibit B) in state buildings such as the airport, and President Biden's Executive branch mask order .

9.  Alaska Air provided inadequate notice of its travel ban, thus causing tremendous stress and increased safety risks while frantically driving to Juneau, on short notice, with extremely long travel days. There was no provision or method to appeal the ban, or even to obtain reconsideration of Alaska Airline's unilateral decision. The ban was then extended indefinitely, without cause, until the government mask mandate was lifted. All these challenges stood in stark contrast to her usual direct 1.5-hour flight from Juneau to Anchorage.

## II.     PARTIES

10. Plaintiff, Lora H. Reinbold, is an individual residing in Eagle River, Alaska.

11. Defendant Alaska Airlines ("Alaska Airlines") is a corporation with its principal place of business in Seattle, Washington. Alaska Airlines conducts business at various airports in Alaska, including but not limited to

Anchorage International Airport in Anchorage, Alaska, and Juneau International Airport in Juneau, Alaska.

12. Defendant Amber Allen is believed to be an employee of Alaska Airlines and is a supervisor in Anchorage and a resident of the State of Alaska.

13. Defendant Brenda Baynard is believed to be a flight attendant for Alaska Airlines and is believed to reside in Anchorage, Alaska.

14. Defendant Diane Birkett-Rakow is believed to be the Senior Vice President of Public Affairs & Sustainability for Alaska Airlines and is believed to reside in the State of Washington.

15. Defendant Laurel Carmichael is believed to be an Inflight Supervisor for Alaska Airlines and a resident of Oregon.

16. Defendant Dorothy Daniels is believed to be a flight attendant for Alaska Airlines and is believed to reside in the State of Alaska.

17. Defendant Kristen Dilley is believed to be a flight attendant for Alaska Airlines and is believed to reside in the State of Alaska.

18. Defendant Miroslava Frias is believed to be a customer service representative for Alaska Airlines and is believed to reside in the State of Washington.

19. Defendant Jeremy Horn is believed to be the Director of Security for Alaska Airlines and is believed to reside in the State of Washington.

20. Defendant Kim Hutchinson is believed to be an employee of and/or lobbyist for Alaska Airlines and is believed to reside in the State of Alaska.

21. Defendant Kyle Levine is believed to be the Vice President and Senior Legal Counsel for Alaska Airlines and is believed to reside in the State of Washington.

22. Defendant Alison Reineccius is believed to be a Supervisor of Alaska Airlines and is believed to reside in the State of Alaska.

23. Defendant Marilyn Romano is believed to be a Supervisor for Alaska Airlines and is believed to reside in the State of Alaska

24. Defendant John Ross Mann is believed to be a flight attendant for Alaska Airlines and is believed to reside in the State of Alaska.

25. Defendant Tim Thompson is believed to be the Director of Public Relations and Community Marketing for Alaska Airlines, and a resident of Washington.

26. Defendant Troy Michael Wuyts-Smith is believed to be an employee of Alaska Airlines and is believed to reside in the State of Alaska.

27. Other Defendants will be named upon discovery.

## III.   JURISDICTION & VENUE

28. The allegations set forth in paragraphs above are incorporated by reference as though fully set forth herein.

29. In the pursuit of justice and a fair resolution, it becomes paramount to undertake a comprehensive examination of the facts. Only by dissecting the intricate complexities of this case can we aspire to achieve a resolution that upholds my fundamental rights, while simultaneously holding the defendants accountable to the standards of fairness and integrity that this court seeks to preserve.

30. This Court possesses subject matter jurisdiction under 28 U.S.C. § 1331, as this action arises under federal question jurisdiction. Specifically, the claims presented in this suit arise under the Constitution, laws, or treaties of the United States.

31. In addition, supplemental jurisdiction is conferred upon this Court under 28 U.S.C. § 1367. This provision allows federal courts to exercise supplemental jurisdiction over state law claims that are so related to the federal claims that they form part of the same case or controversy under Article III. In this instance, the state law claims are closely intertwined with

the federal claims, warranting consideration under a unified judicial proceeding.

32. The Venue is proper in this Federal District Court pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to the claims occurred here. Given that Lora and many of the Defendants are believed to work and reside in or near the City of Anchorage, proceedings should be held in Anchorage.

## IV.    BACKGROUND AND FACTS

33. All causes of action arise from defendants' actions in respect of the mask mandate imposed on fliers during the "pandemic." Defendants worked together, to act intentionally against my interests, including my constitutionally protected right of speech, travel, and due process.

34. Defendants ignored my disability status, precluded me from flying, targeting me for public humiliation and shaming, actively worked to harm my public reputation, and generally exercised unconstitutional tyrannical authority over me and my traveling needs. This complaint is about an Alaska State Senator who peacefully protested the controversial Federal Government's mask mandate and requested reasonable medical accommodation.

35. Lora had flown on Alaska Air for decades and was a member in good standing as an MVP gold member of Alaska Airlines in 2021. However, Lora was denied those earned member benefits, due to the travel ban that Alaska Air illegitimately imposed on her.

36. **April 2020**- Alaska Air instituted a private, mandatory mask policy, with no medical exceptions allowed. Lora respected this policy on subsequent flights, even though she had medical conditions that made it physically uncomfortable and unhealthy, to breathe through a restrictive mask.

37. **July 24, 2020**, Governor Dunleavy instituted a policy, mandating that masks be worn by people inside state buildings, including airports. (see exhibit B)

38. **November 15, 2020,** Lora was flying an Alaska Air flight from Dallas, Texas to Portland, Oregon (flight AS 655, seat 16 C), a woman sitting behind Lora raised her voice, and complained to Lora that her mask was down too long while she was eating. The gentleman across the aisle said, "masks are going to cause a civil war." To diffuse the situation, Lora stopped eating, put her mask on and her coat over her head, and kept quiet because the woman behind seemed nervous and agitated. No flight attendant was called to address any issues.

39. As Lora was boarding the next flight, AS # 183 from Portland to Anchorage (seat 17 c), unexpectedly, she was met by unknown gate officials. Apparently, the lady that sat behind her had complained to Alaska Air staff, that Lora had kept her mask down too long while eating. Laurel Carmichael, an inflight supervisor, was at the boarding gate, to inspect Lora's double-layered fish print cloth mask.

40. Soon another unknown gate official came up to observe Lora's face mask, and they concluded that Lora's mask covered both her nose and mouth. However, they stated Lora's mask did not also cover her chin, so they told Lora that she would have to wear a second, blue cloth mask. Until Lora agreed they would not allow Lora the entry to the gateway. They said that a second mask would be brought to her on the plane.

41. Soon after Lora boarded the plane, Alaska Airline employees believed to be Laurel Carmichael, Dorothy Daniels, John Ross Mann, Kirsten Dilley, Brenda Baynard were in the aisle. They were hovering and towering over her, looking down on Lora. They made Lora feel that she had been singled out and was very uncomfortable and intimidated. Inflight supervisor, Laurel Carmichael, with Dorothy Daniels standing behind her, sternly told Lora, in front of the other passengers that she must also wear the blue paper mask.

42. Lora explained to them that she had medical concerns and was bewildered inquiring about the Defendants arbitrary double mask requirement. Lora had concerns about being able to wear one mask safely and comfortably, let alone two masks, for the entire long flight, because wearing two masks could cause Lora more harm than good. Lora feared that with two masks on, she would not be able to breathe safely.

43. The four employees were standing up, backing the supervisor, and Lora was told that she had to comply. This conversation took place in the presence of all the other passengers on the plane. Lora felt embarrassed and bullied in this small space where the aisle was being blocked and why so many employees were towering over her unable to escape this intimidating interaction.

44. Lora respectfully questioned the Alaska Air staff who imposed such an arbitrary measure. However, Lora put both masks on without resistance. Lora felt coerced and if she did not comply there would be repercussions including being removed from the flight. Lora believed she was targeted unfairly.

45. To express her views about the situation, Lora posted on social media about Defendants being mask bullies and about the arbitrary mask tyranny

of being required to wear two masks. The post unexpectedly had a strong mixed reaction from the public. To diffuse unexpected pushback Lora brought a cake with an apology to Alaska Airlines at the Anchorage international Airport. (exhibit C which received mixed public comments).

46. Later on the flight, Lora interviewed a flight attendant who identified himself as John Ross (his full name is Johnny Ross Mann) on a recording, with his permission, describing her difficulties and asking for clarification of the Alaska Airlines "yellow card" policy. (exhibit D) Unbelievably Lora was told she would learn about the yellow card policy when she received a "yellow card." This was a physically difficult flight for Lora, but she respected and abided by, even to her own detriment, the employee's arbitrary double mask requirement. However, when Lora could no longer safely breathe, she had to take her fish print cloth mask off and wear just the blue paper one provided by Alaska Air, because it was a struggle trying to breathe with two masks.[1] Lora was given no noncompliance warnings on the flight.

47. **November 30, 2020,** Lora received a text from an Alaska Air flight attendant. This communication asked if Lora was flying to Hawaii on Dec

---

[1] Confirmation number YEQWWB ticket number 027216874231.

1, 2020, and asked her to give the attendant a call. During the phone call, the flight attendant stated that Lora would be watched/targeted, and that there would be supervisors in yellow vests watching for her as she entered the terminal, and in the check-in area, all to ensure that she was fully complying, by wearing a mask.

48. Because there had been no previous non-compliance issues on earlier flights, Lora was very surprised to receive this warning. The flight attendant informed Lora that a flight attendant had overheard another flight attendant in the jetway say that she dreaded being on the flight to Hawaii on December 1st, because she knew that Lora was going to be on that plane, and the attendant thought there may be trouble/issues (for reasons unknown to Lora, but the concerns may have been due to the post on social media about being told to wear two masks on Nov. 15, 2020).

49. **December 1, 2020**, As Lora walked into the terminal, there were two Alaska Air employees, thought to be supervisors, in yellow vests, conspicuously keeping watch on Lora. Misty (last name unknown) and Justin (last name unknown) are believed to be the two monitoring her in the arrival/check-in area. Lora was clearly closely watched and monitored at the gate area, and on the plane, and the experience was very

intimidating. Kari, (last name unknown), a flight attendant, was also clearly monitoring and watching Lora. Lora arrived in Hawaii without any incident.

50. Alaska Air has a company policy of first issuing a "yellow card" with a printed warning, acting as state actors, to passengers who are "non-compliant" with any violation the Executive branch's mask policy. No mask noncompliance warnings were given, and no "yellow card" warning was presented to Lora. At some point during the flight, Lora may have been asked to put her mask up higher on her nose. If so, Lora respected the policy, without incident.[2] Lora returned a few weeks later to Anchorage without incident.

51. **January 15, 2021**, Lora had purchased a ticket on Alaska Airlines to attend the upcoming legislative session. Prior to boarding, Lora inquired with the gate attendant, who referred her to supervisor Amber Allen, to discuss Alaska Airlines' policy concerning Lora's' qualified mask exemption. While wearing a mask in the boarding area Lora explained that she had medical conditions and a qualified mask exemption and asked the supervisor to accommodate the mask exception. Amber Allen, a supervisor for Alaska

---

[2] Confirmation code SARXAT.

Air, stated that Alaska Airlines allowed no mask exemptions. Lora again respected and abided by mask policy even though she does not feel well wearing the mask, because her medical condition is worsened on the flights, with extensive mask usage.

52. **January 21, 2021**, President Biden issued Executive Order # 13998, published in the Federal Register Vol. 86, No. 15. It created a requirement for passengers and crew to wear masks, during airline travel, and in airports around the country.

53. **February 1, 2021**, The Transportation Security Administration, as a subdivision of the Department of Homeland Security, issued a Security Directive to implement the Executive order.

54. **Feb 3, 2021**, Acting on the president's Executive Order, the Center for Disease Control (CDC) issued an Order, requiring masks to be worn on public transportation conveyances and at transportation hubs. The CDC's Order was also published in the Federal Register, Vol. 86, No. 21, p. 8025[3.] 86 FR 8025 - Requirement for Persons To Wear Masks While on Conveyances and at Transportation Hubs was published in the Federal Register Volume 86, Issue 21 (February 3, 2021). entitled "Requirement for

Persons To Wear Masks While on Conveyances and at Transportation Hubs."

55. The CDC Order included an exemption for those people who had a disability that made it unsafe/unhealthy for them to wear a mask. The exemption included "A person with a disability who cannot wear a mask because it would cause the person to be unable to breathe or have respiratory distress if a mask were worn over the mouth and nose." The CDC's order takes precedence over any airline policy that may have been in place prior to the president's executive action.[3] The order clearly included an exemption for those persons who had a disability that made it unsafe for them to wear a mask.[4]

56. **February 5, 2021**, The DOT's Office of Aviation Consumer Protection set out a Notice of Enforcement, which informed airlines that they must grant face mask exceptions to those with qualified disabilities. DOT gave carriers 45 days of immunity from enforcement action (until March

---

[3] Joe Biden's Executive order 13997, January 21, 2021.
[4] The exemption stated as follows: "The following persons with disabilities might be exempt from CDC's requirement to wear a mask based on factors specific to the person: A person with a disability who cannot wear a mask because it would cause the person to be unable to breathe or have respiratory distress if a mask were worn over the mouth and nose."

22nd), to comply and develop necessary procedures to accommodate passengers.

57. On its webpage where <u>travel advisories</u> were posted, Alaska Air stated that "federal law requires guests to wear a mask over their nose and mouth at all times during travel, including throughout the flight, during boarding and deplaning, and while traveling through an airport."

58. Because the DOT's 45 day pause on enforcement action ended on **March 22, 2021**, it was expected that Alaska Airlines would publish a clear policy on face mask exceptions by that date and make the published policy available to its passengers. However, the airline failed to mention the mandatory exceptions and accommodations for those with mask exemptions. When tickets were being purchased and during check-in guests were not allowed to check-in if the traveler did not agree to the mask mandate in full.

59. At the airport, employees repeatedly said that no mask exemptions are allowed, the illegitimate stance was published in the media as well. Lora, even with a qualified medical mask exemption, respected to the best of her ability, the mask policy set out by Governor Dunleavy's mask order,

President Bidens CDC mask order and the Alaska Air mask policy in the flights below, including but not limited to those noted below:

60. **March 25, 2021**, Lora flew on Alaska Air from Juneau to Anchorage.

61. **March 28, 2021**, Lora flew on Alaska Air from Anchorage back to Juneau.

62. **March 31, 2021**, Lora flew on Alaska Air from Seattle to Spokane. Lora brought flight attendant little bags of candy to thank them for their service during the pandemic.

63. **April 4, 2021**, Lora flew on Alaska Air from Spokane to Seattle to Juneàu.

64. **April 22, 2021**, Lora flew on Alaska Air from Juneau to Anchorage, with a return ticket to return to session on **April 26th, 2021**, that was wrongfully canceled without notice.

65. Plaintiff, Lora H. Reinbold, was an elected Alaska State Senator at the time. She served on several Senate Committees and was Vice Chair of State Affairs and Legislative Council. Lora inquired again on April 22, 2021, at the check in counter, whether Alaska Airlines provided accommodations for those persons whose doctors had provided a written mask exemption, that prevented them from safely being able to wear a mask.

66. The Alaska Airlines check-in agent begrudgingly looked up the policy, in the airlines internal system for it was not publicly available. The check-in

agent stated that a passenger had to have a PCR within 72 hours. Lora

noted she had had a negative PCR test approximately 96 hours/4 days

earlier.

67. The check-in agent told her, that her mask exemption from her doctor

    had to be reviewed, along with her medical records, by the Alaska Airlines

    medical doctor to approve an exemption on Alaska Airlines. Lora explained

    to the Alaska Airlines check-in agent that such action would violate the

    Federal HIPAA law, for Alaska Airlines to require Lora to surrender her own

    medical records to the Alaska Airlines doctor, before they would grant her

    the exemption.

68. At that point a few other check-in agents began insisting that Lora wear

    the blue cloth mask, instead of her face shield recommended for her

    disability by her doctor. She was required to wear the blue paper mask.

    Lora felt overwhelmed by the comments from multiple agents chiming in

    and politely left the check-in area, with the blue mask in hand. She then

    replaced the face shield recommended by her doctor and placed the blue

    paper mask on over her mouth and chin and kept it on during the entire

    TSA process, in the boarding area while waiting to board, and on the flight.

69. Lora was able to obtain the airport videos from **April 22, 2021**, from the Juneau Police Department via the airport manager. While quietly waiting, with my mask up, in the boarding area, the Juneau police department showed Lora suddenly surrounded by airport and Alaska Air staff, Juneau Police and the lead TSA agent, Amanda, acting in anticipation of something, at the departure gate. Apparently, Troy (from Alaska Airlines) had gone to TSA to get Amanda, the lead officer, to watch the confrontation. A Juneau police officer was by her side, in an intimidating stance and at times had his hand on his holster. (video exhibit E)

70. Alison, an Alaska Airlines supervisor came and was towered over Lora, trying to intimidate and provoke Lora by asking if she was "going to be trouble" on the flight without even extending the courtesy of introducing herself. Lora inquired the person confronting her to identify herself. Alison stated she was a "supervisor for Alaska Airlines."

71. Alison continued to berate Lora and insisted that Lora agree to wear the mask "100% of the time" on the flight, indicating that Lora was not allowed to eat or drink on the flight, unlike other passengers. Lora informed the supervisor that she had a mask exemption but was going to do her very best to follow the policy. As Lora tried to get around Alison,

Alison pursued Lora, calling out Lora's name, which was alarming and embarrassing, as there were passengers and people of interest in the area.

72. As Lora tried to board, a man in a yellow vest, abruptly threatened Senator Lora Reinbold saying: "I will cancel your ticket, if you don't put your mask on." Videos obtained from the airport clearly show Lora's mask was on and up, covering her nose and mouth in compliance with Alaska Airlines policy, the Governor's mandate, and the CDC guidelines.

73. The entire event felt coordinated. Knowing something was not right, Lora recorded the names of those involved on her phone and took a brief video to recall this unnerving situation, this is when Lora learned the person who threatened to cancel her ticket was Troy Michael Wuyts-Smith.

74. At all times, Lora spoke in a composed, polite, and reasonable manner, and not being quarrelsome or contentious. The video also clearly showed Lora wearing a face mask over her nose and mouth, even with an exemption, but in order to travel on the airlines, she was coerced to wear a paper mask.

75. Lora felt targeted, singled out, bullied, and intimidated by the combined, unexpected, and sudden presence of a Juneau police officer, an airport policeman, Alaska Air staff, and other passengers who were obviously

delaying their own boarding onto the plane, were now watching her

closely in the airport. They may have been federal air marshals.

76. The video also shows that Lora in no way delayed the flight. Of interest, Nona Dimond's was recording the ordeal. Lora was not the last person to board the plane. Somehow media firms broadcast Lora had delayed the flight which caused additional public outrage.

77. However, the flight on **April 22, 2021**, back to Anchorage was uneventful, with no confrontation or adverse interaction between Lora and any other passengers or any Alaska Air staff.

78. Nothing happened when Lora disembarked in Anchorage, either.

79. However, Tim Thompson started communicated false and misleading information to the media including local news, national media such as CNN and other legacy media. Nona Dimond, A former legislative staffer and IBEW employee, conjured up a slanderous portrayal of the Senator Lora Reinbold's boarding experience, that immediately went viral on social media. Nona provided footage to the Alaska Landmine and beyond that amplified the false narrative and sadly was repeatedly broadly. (see exhibits P & Q)

80. They stated that Lora had "refused to wear a mask" on the flight, had delayed the flight, and that "the police were involved." This false information leaked by employees of Alaska Air aired on local, then national and then international news stations around the world.

81. Then Senator Lora Reinbold was inundated with a flood of hostile and hateful emails, letters, and phone calls - based on the false information leaked to the media and placed on social media. All this hateful communication was very distracting. It greatly interfered with Lora's attention to her duties as a legislator and was personally demoralizing and very emotionally distressing to Lora. (Although this was very painful to rehash and put together see exhibit F)

82. **April 23, 2021**, after a peaceful flight on April 22, 2021, back to her home district, unexpectedly on April 23, 2021, Lora received an email from Alaska Airlines. It stated that she had been banned on all future flights until further review, which was an unanticipated shock. Lora's flight back to Juneau for legislative session, the following Monday, was unbelievably canceled and removed from her Alaska Airlines app.

83. This shocking action was clearly a breach of the contract of carriage. The flight ban was a completely unanticipated event. Lora, as an elected

official, had to urgently figure out how to get to Juneau by the following Monday, where there was a critical vote in the Senate on HB76, Gov Dunleavy's disaster declaration extension bill, with which Senator Lora Reinbold, and many of her constituents, and citizens across the state passionately disagreed with.

84. The Governor had taken extreme measures on Feb 18, 2021, (exhibit G) releasing an egregious letter that humiliated Lora, all to punish her because of her stance defending medical & constitutional freedom. Lora had criticized the unsubstantiated unconstitutional covid mandates imposed by his administration. (People's Petition to their government exhibit H) The timing of the ban, coming just a few days before the Senate vote on HB76, was of particular concern. The Governor's wife, Rose Dunleavy, interestingly does work for one of the named defendants.

85. Interestingly, Senate President Peter Micciche, who had expressed interest in being a Lt Gov candidate, personally received a call from Alaska Airlines, believed to have been from Kim Hutchinson or Vice President Marilyn Ramano, on April 22. Defendants informed him of Senator Lora Reinbold's sudden and indefinite ban. Senator Micciche made comments to Senator Kawasaki (believed to have been at the Resources committee)

to the effect Lora's would face challenges, and life was going to "get difficult" moving forward.

86. Notably, Senator Micciche did not directly or immediately communicate these sentiments to Lora. Much later he relayed to Lora that when Defendant called the Senate President to inform him of the Senator Reinbold's flight ban, he told them to make sure they had a "good reason" to ban her.

87. **April 23 and 24, 2021**, to help diffuse and address the unanticipated situation, Lora contacted a friend, Ken Thompson, an Alaska Airlines board member. Lora tried to obtain some understanding about the sudden and arbitrary action of the serious flight ban and attempted to work things out privately. Unfortunately, Lora's efforts were not successful, Defendants were determined to move forward with what appeared to be a pre-planned ban and public media ordeal to harm Lora's reputation.

88. Lora stated to Ken that it would be best for both of them, to not air this situation in public. After a few more inquiries, Ken instructed Lora to work only with Jeremy Ross (he meant Jeremy Horn), who was the head of security for Alaska Air. Ken texted that Debbie Birkett Rakow, a senior VP

of Government Affairs for Alaska Air, had been communicating with Jeremy, about Lora's situation.

89. Despite Lora's repeated attempts to seek assistance from Ken and highlight the unjustified negative media attention, particularly in the absence of a formal hearing or even a direct communication from the airline, her concerns went unaddressed. Ken quit communicating and Lora was directed to work with Security, which was very humiliating. To the best of Lora's knowledge, she has yet to receive a direct phone call from Alaska Airlines leadership to discuss the matter.

90. Sadly, Alaska Airlines released several public statements based on a misleading narrative about Lora, that led to numerous false stories published. Defendant used Lora's name broadly to local and national media outlets, with neither her knowledge nor consent. The ensuing narrative, primarily fueled by Alaska Airlines' inaccurate portrayal of events concerning the mask incident, subjected Lora to significant humiliation and scrutiny locally, nationally, and internationally. (exhibit I)

91. Despite the escalating situation, Lora endeavored to maintain her composure and responded carefully and respectfully to the media as time

allowed, under demanding and the stressful circumstances of figuring out how to immediately return to Juneau.

92. **April 24-26, 2021**, Lora, with her husband, frantically drove 750 miles, including through Canada, via Haines Junction and luckily were able to catch the five-hour ferry to Juneau. There were challenges including enduring extensive intimidating interrogations bringing Lora to tears and intense scrutiny at the Canadian border, due to the massive negative media attention that had spread around the world, even by that short time. During this journey, she encountered challenges at the Canadian border, a situation exacerbated by the significant negative media coverage surrounding her ban from Alaska Airlines, that had spread around the world, even in that short time.

93. As Lora was traveling through Tok on her way to Juneau, received an urgent call from Jerry Anderson, the director of the Ethics Committee, notifying her that an ethics investigation was moving forward on her, and he wanted her to cooperate. Upon her arrival in Juneau, Lora promptly sent an email to Mr. Anderson, asserting her desire to have all her constitutional rights immunities and protections upheld and respected, for no tribunals could be held while legislators were in legislative session.

94. The misleading statements made by Alaska Airlines employees perpetrated numerous misguided media stories locally, nationally, and internationally. Lora was contacted by local, state, national and international media outlets, but was unable to respond to these allegations because she was on a long journey to Juneau. Lora and her husband had to drive long extensive hours over the weekend in treacherous conditions thru Canada to catch the only ferry to Juneau via Haines in January.

95. **April 24, 2021**, Lora received a letter from Jeremy Horn, the Director of Security for Alaska Air. Mr. Horn wrote that Lora would hear back from them with her email input by May 23rd, 2021. Mr. Horn informed Lora that she could provide them more details, which she did, reiterating the uptight and harsh intentional treatment of Alaska Airline employees at the Juneau airport on April 22, 2021. Lora also let Alaska Air know that, about one month previously, she had endured a hostile and negative encounter with Troy Michael Wuyts Smith at a local grocery store, that she had reported the incident to the store's security and was escorted to her car by security because she feared Troy may be in the parking lot after his outburst in the store. (exhibit to be provided at discovery)

Unfortunately, Alaska Airlines negligently ignored Lora's' concern of the repeated combative behavior, by Troy Michael Wuyts-Smith. Troy stated plaintiff was "killing people" by not wearing a mask. The threatening, intimidating behavior towards an elected official were particularly egregious and created liability to the Airlines.

96. Lora believes she respectfully adhered to employees' requests. The letter said there was a (non-specified) mask non- compliance incident on April 22, 2021, that lead to the unprecedented ban. The director of security also wrote that Senator Reinbold's travel ban would remain in place until the mask mandate was lifted. Lora was given no due process, no appeal and no remedy for the extreme measure of banning her indefinitely.

97. Lora was not given a single initial warning. nor a final warning where they issue a yellow card onboard. Clearly Alaska Airlines violated its own yellow card policy, that empowered flight attendants to issue a yellow card for any guest who repeatedly refused to wear a mask onboard.

98. The US Department of Transportation has an Airlines Passengers with Disabilities Bill of Rights, to implement fundamental rights to air travelers under the Air Carrier Access Act. 14 USC CFR Part 382. The Bill of Rights

consists of, among others, The Right to be Treated with Dignity and Respect, The Right to Receive Seating Accommodations and The Right to Resolution of a Disability Related Issue, all which were repeatedly denied by Defendants.

99. **April 27, 2021**, Lora asked Jeremy Horn to please explain exactly how and why Alaska Air thought that she had violated the mask policy (including Governor Dunleavy's mask policy, or the CDC policy and/or the Alaska Airlines mask policy). Lora informed Mr. Horn that she had worn a mask at TSA, in the boarding area and during the entire flight on April 22nd. This was against medical advice for Lora had a mask exemption written by a medical doctor, but Alaska Airlines would not honor her mask exemption.

100. Lora expressed how confrontational Alison had been. Lora was able to obtain the videotapes from the Juneau Police Department on or about April 22, 2021, please review exhibit E attached.

101. In the email Lora reiterated how confrontational Alison, an Alaska Airlines employee, had been. Alison was towering over Lora, trying to intimidate and provoke Lora by asking if she was "going to be trouble" on the flight without even extending the courtesy of introducing herself.

102. This was a targeted event, no other passenger got this type of treatment, Alison insisted that Lora agree to wear the mask "100% of the time" on the flight indicating that Lora was not allowed to eat or drink on the flight, unlike other passengers. Lora informed the supervisor that she had a mask exemption but was going to do her very best to follow the policy. As Lora tried to get around Alison, Alison pursued Lora, calling out Lora's name, which was alarming and embarrassing as there were still passengers and people of interest in the area.

103. Defendants were attempting to provoke me, first by Alison's confrontational interrogation and then by heightened tension and threats from Troy he would "cancel my flight if you don't put the mask on!" even with a qualified mask exemption, my mask was clearly up complying to the state, federal executive policy recommended by the CDC guidelines. When I look back at the video that captured my airport experience, I still feel humiliated, mistreated and wonder if this incident was pre planned and/or supported by Alaska Air's leadership. In the video, I am surrounded by airport personnel, including TSA Agent Amanda and a police officer from Juneau, and an Alaskan Airlines supervisor who was confronting me as other employees watched with anticipation.

104. My interactions with them are always polite and controlled, yet I felt targeted, as if something conspicuous was about to happen. In the video, I can be seen wearing a mask despite having an exemption to do so, because I couldn't afford to miss the flight home for my husband's birthday weekend.

105. Lora while traveling, had with her a CDC-compliant mask exemption, written by a physician and always willing to provide it to Alaska Airlines. However, Alaska Airlines staff members refused to honor the CDC mask exemption on every flight that she took and were not interested in seeing the exemption.

106. During the extraordinary near yearlong ban, there were at least *four* special sessions, in addition to the main legislative session during this time. Lora was required to travel extensively, the long routes, between Juneau and Anchorage for all those sessions.

107. Because of the actions by Alaska Airlines, Lora suffered a loss of reputation in the community, due to a tremendous amount of widespread negative media attention, related to Alaska Air's unreasonable travel ban. In addition, even in a family emergency, Lora did not have travel options to

return home, which caused her deep concern and a feeling of isolation in Juneau.

108.  Lora also lost numerous opportunities to serve her constituents and perform her duties in her district during this time, due an inability to get home at all, or to the extensive travel time that was required to get through Canada, and/or having to take a multiple day ferry trip to Washington state and fly via another carrier from Seattle to Anchorage.

109.  Alaska Air also forfeited Lora's MVP Gold status, due to its travel ban, so she was denied all the benefits (including extra milage awards for future flights) provided with that position.

110.  **On April 30, 2021**, Lora's' birthday, she received an email at 5:54 a.m. from the director of Security, Jeremy Horn, of Alaska Airlines. (Coincidently, Lora also got sued this day for temporarily banning, what she thought was a troll, on social media who was violating the page rules repeatedly). In the email, Mr. Horn acknowledged and thanked Lora for her previous communications. He made allegations of Lora's non-compliance with mask mandates and unspecified/mysterious combative interactions with Alaska airline staff at one point or another. Lora disputes

these characterizations, asserting that her interactions to the best of her recollection consisted of respectful inquiries while asserting her rights.

111.  To the best of her recollection, Lora respected and complied with specific employee requests regarding mask-wearing to the best of her ability, even with a mask exemption. Mr. Horn emphasized the airline's policy and the federal mandate for all guests to wear masks for safety during the COVID-19 pandemic, noting exceptions only during eating or drinking.

112.  Specifically, Mr. Horn cited an incident of unspecified mask non-compliance on April 22, 2021. After a committee reviewed the matter behind closed doors, Alaska Airlines decided to uphold the flight ban, without due process or additional information, why the extended ban for Lora was put in place, for the entire duration of the Executive branch mask mandate.

113.  Lora had emphasized that she received neither a warning nor a yellow card during the April 22 flight: describing the flight as peaceful and uneventful. Lora's did not have a noteworthy interaction on the flight. Lora was "complying" to the policy, even with a mask exemption. A friend sat in the row in front of her and agreed to verify the flight was

uneventful/peaceful and that there were no negative interactions at all, between flight staff and Sen Reinbold.

114. Additionally, Lora asserts that, in accordance with the State of Alaska Constitution in Article 2 Section 6 Legislators possess legislative immunity during her transit to and from legislative sessions and the flight ban on the monopoly airline was illegitimate.

115. **May 26, 2021**, she received and email from M. Frias, for Lora was denied a ticket on Alaska Air, even after her 30-day ban ended. Senator Lora Reinbold had another special legislative session to tend to in Juneau, where she had to travel excessively the long routes to/from Juneau, so this was quite stressful.[5] Several times she had to take this journey alone. There was also a special session in July where Lora had to endure unnecessary additional travel in order to get to the state Capital for yet another session. Delta was providing service from Seattle to Juneau during the tourist season, which was helpful.

116. **On August 6, 2021**, Lora communicated with Alaska Airlines to inform them of an upcoming 30-day special session in Juneau scheduled later that

---

[5] Ref 6449596 letter from Alaska Air dated May 26, 2021

month. She further noted the cessation of Delta's services in mid-September and inquired about the status of her ban with Alaska Airlines.

117. Citing her constitutional protections, Lora emphasized that she cannot be detained or held accountable by any tribunal while performing her legislative duties. She referenced the provision stating that members of the legislature, while attending, en route to, or returning from a legislative session, are not subject to civil process and are immune from arrest, except in cases of felony or breach of the peace.

118. In this correspondence, Lora sought the identities of all individuals involved in the corporate decision to impose the ban on her. Furthermore, as a State Senator, she requested clarification regarding Alaska Airlines' authority to enforce mask mandates within state-owned premises such as the state-owned airport.

119. **On August 9, 2021**, Lora received an email from Kyle Levine, Alaska Airlines Legal Senior VP of General Counsel and Corporate Secretary Compliance officer, in response to her letter to Jeremy on August 6th. Kyle wrote her flight privileges remain set out in the April 30, 2021, letter, for as long as a mask mandate remains in place for airports and aircraft.

120.  Kyle stated the legislative immunities apply to acts of a judicial or law enforcement authority and claimed Alaska Airlines is neither. He said a committee had reviewed my interactions with employees and decided to suspend my flight privileges for the reasons below yet withheld their names. He cited SD 1542-21-O1A which authorizes airport operators and airlines to enforce the mask requirement on the premises of airports that are obligated to maintain an aviation security program. Clearly, Alaska Air was acting as a state actor enforcing the Executive branch mask mandates instituted by both the state and federal government.

121.  Interestingly, Juneau International Airport is subject to the directive regardless, of ownership by the city. Lora has enhanced medical complications while moving with luggage. Lora had inquired with Juneau police officer, Mr. Phelps, in the Juneau airport about penalties for noncompliance. He had previously said there was a low dollar fine, for not wearing a mask. In the past she had let him know, it was worth it for her to pay the fine, if he ticketed her. She informed him for she had a mask exemption and being able to breathe freely without a mask was important to her.

122.   Because of the extended, unwarranted flight ban Lora had to make difficult travel arrangements yet again, to be in Juneau from the abovementioned options. On the way to Juneau, she was able to take Delta airlines to Seattle and fly from Seattle to Juneau.

123.   Delta does not travel intercity within Alaska. Senator Reinbold had a ticket on Delta on Sept 11, 2021, to return to Anchorage. Session got extended past this date, so President Micciche asked Senator Reinbold to stay to vote. However, Delta had suspended the flights for the summer season. Senator Micciche inquired with Alaska Airlines lobbyist, Kim Hutchinson, to see if an arrangement could be made to get Senator Reinbold to Seattle.

124.   Kim Hutchinson came to Senator Lora Reinbold's office to discuss the matter. Lora wanted to know why the initial ban had been instituted and extended without due process, but the lobbyist could not clarify. When Lora asked Kim if the CEO, Ben Minicucci (who had previously stated he had political power and was going to use it) was aware of situation? He said he believed so.

125.   Lora also asked if Alaska Air could simply fly her to her hometown of Anchorage rather than drop her off in Seattle? No reason was given why

Alaska Airlines would not fly her to Anchorage. Lora communicated the stress and hardship of the flight ban to the Kim, but he could not provide answers to the questions and did not formally offer a resolution to the difficult situation.

126. **Sept 12-16, 2021**, Senator Reinbold's only option to get home from session was to take the 3.5-day bimonthly ferry to Bellingham. Lora did not have a vehicle available to drive home. Unfortunately, no rooms which were $1200 for the journey were available at this late notice on the state ferry. Lora slept on the deck of the ferry after getting a mattress from a local thrift store. There was no, much needed privacy, during a time of heightened national media attention, on this rocky long journey. The stabilizers were broken on the ferry and the seas were rough. People were throwing up all around her in the middle of the night on this rough journey in rough seas. This was a very unfortunate, uncomfortable and at times miserable trek down to Bellingham. (exhibit J)

127. While on the ferry, without Senator Lora Reinbold's permission, her Chief of staff Kelli Toth, interviewed with New York Times, discussing the fact Senator Lora Reinbold had requested to be formally excused for the

October session, for travel was becoming increasingly unsafe as winter approached.

128. Again, Lora found herself in the middle of a national media ordeal. This time the headlines, comments and hostile comments were unbearable. She had to block numerous outsiders from vicious attack on her social media but was unable to control the massive outpouring of hate towards her from around the nation. (Exhibit K)

129. An industry recognized safety protocol: OSHA 29 CFR, 120, describes IDLH "Immediately Danger to Life and Health." Lora believes she met this dangerous OSHA standard while in transit to Juneau in January 2022. Senator Lora Reinbold and her husband were forced to endure a brutal experience driving in -40 below weather encompassing 5 very long days via Canada to catch the only ferry from Haines to Juneau on **Jan 13, 2022**. The travel was highly stressful, and we endured life threatening conditions. Although Lora had immunity built from having had Covid, Lora did not have a covid vaccine card and was denied pre-paid accommodations. Lora and her husband feared being turned around at the tough border crossing for at -44 below we were told they denied border crossing. If that

happened Senator Lora Reinbold, she feared she would miss the entire 2022 legislative session.

130. The discrimination Lora endured at the boarder crossing due to covid mandates & illegal discrimination was extremely distressing. Canadian authorities denied their pre-paid accommodations, for a much-needed overnight rest. We were forced to continue to drive in blizzard conditions thru the night. We did not see other vehicles on the unmaintained roads for several hours, it was nerve racking. (exhibit L video) Canadian Authorities clearly violated a national nondiscrimination Alcan border Treaty while discriminating against US citizens the ability to travel without hinderance, by denying accommodations for the non Covid vaccinated, and mandating negative PCR tests.

131. Several weeks later, Lora was in critical need of a break from Juneau, during a very stressful session, Lora was able to purchase a ticket from Alaska Airlines to head home for the weekend on **February 18, 2022**. To great disappointment, even with the mask exemption in hand and a now a letter from her ADA lawyer (exhibit M) Alaska Airlines sadly denied her boarding.

132. Lora was unable to get home to meet with constituents, attend meetings and spend time with family. Lora had a meltdown right after she left the airport. She called her legal counsel and close friend to comfort her during this tough weekend. Interestingly Sen Mike Shower had his mask below his nose at the airport this day. Later Mike told us at some point got a yellow card warning, but was never banned, which shows by Alaska Airlines arbitrary and capricious actions when they chose to ban specific people and not others for the same alleged violations.

133. With continued hope, the ban would be lifted, and in great need to get home, there were additional flights where Lora was able to purchase tickets. However, Alaska Airlines continue to deny access on their monopoly commercial airline to her hometown.

134. In the **spring of 2022**, Lora sent a letter to Alaska Airlines, from her lawyer stating a lawsuit was pending, if Alaska Airlines did not restore access to flights for plaintiff. We got no response.

135. Thankfully on **April 18, 2022**, the Executive branch mask mandate was stricken down as unlawful, and Plaintiff was able to resume travel on Alaskan Airlines, due to District Court Judge Kathryn Mizzelle's Court Order. (See Judicial note docket 31, Case No: 8:21-cv-1693-KK.M-AEP)

*136.* *"It is indisputable that the public has a strong interest in combating the*
*spread of [COVID-19}."Ala. Ass'n of Realtors, 141 S. Ct at 2490. In pursuit*
*of that end, the CDC issued the Mask Mandate. But the Mandate*
*exceeded the CDC's statutory authority, improperly invoked the good*
*cause exception to notice and comment rulemaking and failed to*
*adequately explain its decisions. Because "our system does not permit*
*agencies to act unlawfully even in pursuit of desirable ends," id, the Court*
*declares it unlawful and vacates the mandate."*

## V. <u>CAUSES OF ACTION</u>

## I. FIRST CAUSE OF ACTION

## For Violations of the Duty of Care Concerning the Treatment of Airline Passengers with Disabilities
## Against Alaska Airlines and employees named and unnamed

137.  The allegations set forth in paragraphs above are incorporated by

reference as though fully set forth herein. Lora has medical conditions

diagnosed by a medical doctor that make it unhealthy and unsafe for

her to wear a face mask for extended periods of time. DOT's Office of

Aviation Consumer Protection directive on February 2, 2021, which

informed all airlines that they must grant face mask exceptions to

qualified disabled individuals holding a medical diagnosis to this

effect, created a heightened duty of care upon Alaska Airlines to

accommodate persons, such as Lora, who has such articulated

medical conditions that increased her health risks when she wore

masks. According to the federal register the mask requirement had exemptions. Please refer to cited reference (https://www.federalregister.gov/d/2021- 02340. This Order exempts the following categories of persons: A child under the age of 2 years; a person with a disability who cannot wear a mask, or cannot safely wear a mask, because of the disability as defined by the Americans with Disabilities Act (42 U.S.C. 12101 et seq.). A person for whom wearing a mask would create a risk to workplace health, safety, or job duty as determined by the relevant workplace safety guidelines or federal regulations). Lora had a mask exemption provided by her physician and met the exemption requirements. However, repeatedly Defendant denied legally required accommodations, and illegitimately banned her from the airline, while making a public spectacle of the mask ordeal, they had craftily created.

138.   Upon embarking on her travel with Alaska Airlines, Lora explicitly and repeatedly informed the airline's staff of her mask exemption provided by her physician.  She requested them to honor the exemption or provide reasonable accommodation in the form of using a face shield or

other medically approved alternative. Other airlines allowed for this reasonable accommodation. Despite being aware of Lora's disability and her request for an accommodation, Alaska Airlines intentionally denied her request and proceeded to ban her from their critical service. Such refusal constituted a breach of Alaska Airlines' duty of care to provide a reasonable accommodation, as such accommodations were both reasonable and necessary to allow Lora to enjoy the same benefits and privileges as those without diagnosed medical condition/disabilities. The directive issued by the DOT additionally supports my entitlement to accommodations.

139.   Notably, face shields were approved by other airlines, approved by the CDC for individuals with certain medical conditions, and endorsed by Lora's physician. Alaska Airlines, in failing to uphold the rights of passengers with disabilities, also wrongfully infringed upon Lora's rights as established by the ADA and other relevant laws and regulations. Alaska Air, in failing to uphold the rights of passengers with mask exemptions wrongfully infringed and breached its duty of care owed to Lora.

140.   To seek justice, it is imperative that Alaska Airlines is held accountable

for their failure to accommodate passengers, specifically in my case. By

doing so, we not only address my individual experience but also affirm

the principles of fairness and inclusivity that underpin our legal system.

## II. SECOND CAUSE OF ACTION

**Violations to the ADA American's with Disability Act, Air Carrier Access Act
CFR 382 Failure to Accommodate in Violation of 42 U.S.C. § 12182 and 12184
et al. 42 U.S.C. §12203(b)**

**Against all Defendants**

141. The allegations in paragraphs above are incorporated by reference as

though fully set forth herein. Defendants violated 42 U.S.C. § 12182, which

prohibits discrimination by public accommodations, and 42 U.S.C. § 12184,

which prohibits discrimination by a private entity offering public

transportation, as detailed in ADA regulations at 28 CFR Part 35, § 35.131

and Title 14 part 382 Nondiscrimination on the basis of disability in Air

Travel. Defendants had a duty to inform individuals with disabilities about

potential accommodations, such as a face mask exemption. Defendants

failed in this duty by not offering Lora reasonable accommodations in line

with her disability.

142. Defendants discriminatorily acted against Lora based on their prior

knowledge of her disability coupled with a mask exemption, denying her

reasonable accommodations while operating as a private entity offering public transportation.

143. The discriminatory actions are more significant, given Defendant Alaska Airlines' position as the sole provider of air services, between Juneau and Anchorage. The denial of services resulted in substantial harm, displacement, and emotional distress for Lora, particularly due to the unreasonable demand of wearing two masks, which was retaliatory and inconsistent with the CDC guidelines.

144. This is not an isolated event; Defendants banned nearly 2000 passengers and demonstrated egregious discriminatory behavior previously, as evidenced by a reported incident involving a 75-year-old passenger with a medical condition Alaska Airlines refused to accommodate (as reported in the Independent by Helen Coffey, dated Oct 20, 2020, exhibit N).

145. Lora claims damages due to these violations, which created physical, mental, and emotional distress. Defendants' continued failure to uphold their duty led to a disproportionate ban from Alaska Airlines flights for almost a year, in violation of the Air Carrier Access Act, 14 U.S.C. § 382 Bill of Rights. Congress never intended for airlines to belligerently abuse the intent of the law, by targeting and denying passengers with disabilities,

travel rights. The ACAA regulations are designed to protect the rights of air travelers with disabilities, and any violations of these rights must be taken seriously.

146. Defendants claim Lora's cause of action, arising under the Air Carrier Access Act (ACAA) should be dismissed because that statute does not provide for a private right of action. Although recognized, when given the opportunity the Ninth Circuit's decision should be overturned, allowing for a private right of action. It is critical to note prior to the Supreme Court's decision in *Alexander v. Sandoval,* 532 U.S. 275 (2001), several Circuits had found that a private right of action did exist under the ACAA. In fact, the Court's holding in *Sandoval* did not immediately change the state of the law concerning the ACAA. In addition, government documents state administrative options do not need to be exhausted before a lawsuit can be brought forth.

147. Furthermore, while defendants acknowledge that the Air Carrier Access Act (ACAA) may also be relevant, it is essential to recognize that the ADA has a broader scope and purpose. The ADA aims to ensure equal access and prevent discrimination against individuals with disabilities in public accommodations, including airport terminals. The exclusion of aircraft

from the definition of specified public transportation does not imply that the ADA does not apply to these areas.

148. The CDC mask mandated exempted certain categories of persons from the mask-wearing mandate, including a person with a disability who cannot wear a mask, or who cannot safely wear a mask because of the disability. It allows airlines to impose requirements or conditions for carriage on the categories of persons exempted from the mask mandate, whether the person is a child under the age of two, a person for whom wearing a mask would create a risk to workplace safety, health, or job duty, or a person with a disability who is unable to wear or safely wear a mask because of the disability.

149. Additionally, on January 31, 2021, the Transportation Security Administration (TSA) issued a Security Directive (SD) to aircraft operators on face mask requirements to implement the Executive Order and to support enforcement of the CDC Order mandating masks. The Department supports actions by the airline industry to have procedures in place requiring passengers to wear masks in accordance with the CDC Order, CDC guidance, and TSA SD.

150. At the same time, the ACAA and Part 382, which are enforced by OACP,

require airlines to make reasonable accommodations, based on individualized assessments, for passengers with disabilities who are unable to wear or safely wear a mask due to their disability. This Notice sets forth the enforcement policy that OACP will apply in determining, on a prospective basis, whether airlines are complying with the requirements of the ACAA and Part 382 when implementing procedures requiring mask-wearing by passengers.

151.  It cannot be concluded solely because aircraft are excluded from "specified public transportation." It is necessary to evaluate Lora's allegations in the broader context of the ADA to determine if they constitute a valid legal claim. Additionally, amending the second cause of action is not futile, as it is essential to thoroughly assess the specific claims made by Lora and their applicability to both the ADA and the ACAA. Considering these factors, a comprehensive evaluation of Lora's stated claims is crucial to reach an informed conclusion.

152.  To conclude, Lora's claim of discrimination against a public accommodation by the defendants, is valid under the ADA. Although the ACAA may address specific disability rights in air travel, it does not automatically exempt airport terminals and related facilities from ADA

compliance. The ADA's objective is to ensure equal access to public accommodations, including airport terminals. The ACAA, signed into law in 1986, prohibits discrimination and retaliation, by airline carriers against individuals with disabilities on commercial air transportation.

### III. THIRD CAUSE OF ACTION

**The Third Claim for Relief for Violation of 42 U.S.C. § 1983 Deprivation of Rights & 42 USC 1985 and 1986 Conspiracy to Violate Civil Rights & Fourteenth Amendment**
**Against All Defendants**

153.  The allegations in paragraphs above are incorporated by reference as though fully set forth herein. Defendants, by virtue of their commission as a private carrier providing public transportation, exercise governmental authority over specific areas, of the airport including the terminal. All alleged discriminatory actions described in this complaint occurred within these zones under the control of Defendants. "To state a claim under § 1983, a Lora must allege the deprivation of a constitutional or federal statutory right by someone under [color] of state law." N.R. v. Sch. Bd. of Okaloosa Cnty., Fla. , 418 F. Supp. 3d 957, 977 (N.D. Fla. 2019) (citing Doe v. Sch. Bd. of Broward Cnty., Fla. , 604 F.3d 1248, 1265 (11th Cir. 2010) Attwood v. Clemons, 526 F. Supp. 3d 1152, 1163 (N.D. Fla. 2021)

154. Consequently, Defendants' actions are deemed to be taken under the "color of state law" as articulated in 42 U.S.C. § 1983. "Lora must also show that Defendant's actions constitute state action. Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n , 531 U.S. 288, 295, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001) (stating that only state action is subject to Fourteenth Amendment scrutiny while private action is not). " Attwood v. Clemons, 526 F. Supp. 3d 1152, 1164 (N.D. Fla. 2021)

155. Defendants knowingly and intentionally took actions aimed at undermining Lora's role in the Alaskan State Senate. Due to the discriminatory way in which Defendants enforced the Executive branch state mask mandate, these actions deprived Lora of her rights guaranteed under the First, Fifth and Fourteenth Amendments to the U.S. Constitution, encompassing her right to free speech, free association, assembly, her right to petition the government for a redress of grievances, and her due process rights.

156. "Thus, both requirements are met when a Lora can show that there is a "close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State." Brentwood Acad. , 531 U.S. at 295, 121 S.Ct. 924 (quoting Jackson v. Metropolitan

Edison Co. , [419 U.S. 345, 351], [95 S.Ct. 449], [42 L.Ed.2d 477] (1974) (internal quotations omitted)."

157. Furthermore, Defendants' arbitrary and discriminatory treatment of Lora, especially their failure to acknowledge or provide accommodations for her, and their refusal to provide for any kind of hearing or appeal of their arbitrary ban, denied her due process rights.

158. This discriminatory treatment resulted in substantial and unwarranted harm to Lora. Defendants, by virtue of their commission as a private carrier providing public transportation, and by working jointly with enforcing Governor Dunleavy's state building mask mandate (see exhibit B mandated was issued in July 2020), exercised governmental authority over specific areas of the airport and Alaska Air's airplanes. All alleged discriminatory actions described in this complaint occurred within these zones under the control of Defendants. Defendants were clearly acting "under color of the law" by enforcing the mask mandate in the airline terminal areas.

159. Due to Lora's long and well-known public service history—including her 6-year service in the House of Representatives, subsequent election as an Alaskan State Senator, appointment to the Chair of the Senate Judiciary,

Case 3:23-cv-00087-JMK   Document 49   Filed 09/20/23   Page 54 of 107

and continued service as a State Senator—Defendants were, or should

have been, acutely aware of her constitutional position and

responsibilities. Despite this knowledge, Defendants exploited their

authority by imposing a travel ban on Lora with Alaska Airlines to and from

Juneau, lasting approximately one year, severely hindering her ability to

fulfill her elected duties. Consequently, Defendants' actions were

performed under the "color of state law" as articulated in 42 U.S.C. Section

1983, when Alaska Air and its employees violated Lora's rights under the

Constitution and state laws.

160.    The airlines' mask mandate egregiously infringed upon my freedom of

expression, protected by both the Alaska and United States Constitutions

and my constitutionally right to travel both interstate and intrastate. At all

relevant times, Lora has a current and valid medical mask exemption.

Despite this, the airlines have unilaterally compelled me to wear a mask,

disregarding my right for accommodation based on valid medical reasons

and well founded in existing ADA and ACAA laws and the mask order.

161.    Defendants later banned me (and hundreds of others) from traveling on

their airplanes because, defendants claim, I was not properly wearing a

mask and therefore violating the mask mandate. In doing so, the defendant

airline was enforcing the government's mask mandate. The government

had no other means to enforce the mask mandate during travel, so the

defendant airlines, along with other airlines, enforced the mask mandate

on behalf of the government. The defendants acted in the capacity of a

state agent of the state and conspired overtly to deprive Lora's' civil rights

and equal protection rights.

162.  Defendants were therefore acting in concert with state actors Governor

Dunleavy and President Joe Biden as willful participants in joint activity

with the state or its agents. U.S. v Price, 383 US 787, 794 (1966). Private

persons "jointly engages with state officials in the challenged action are

actions under color of law for purposes of Sec. 1983. *(See US v Price,* 383

US 787, 794 (1966). "To act "under color of the law" does not require that

the accused be an officer of the State. It is enough that he be a willful

participant in joint activity with the State or his agents" *Id* at n. 7.

163.  As the Plaintiff in this case, I contend that Cause of Action Three asserts

a valid claim under Section 1983 against the defendants, who acted

under color of state law and deprived me of my constitutional rights. I

assert that the defendants have acted under color of state law by

establishing interdependence and joint participation with the

government in this activity as private carriers engaged in public transportation. Their authority over specific areas of the airport and involvement with the government make them joint participants and bring their actions within the scope of the Fourteenth Amendment.

164. Defendant, Alaska Airlines received government funds (almost a billion dollars in one package) which raising questions about, to what extent, Alaska Airlines became a defacto state actor due to accepting, spending and enforcing the requirements of "covid mitigation plans" that violated existing laws and constitutional rights.

165. Although some courts have held that airlines and airline personnel are not typically considered state actors under Section 1983, I argue that these cases do not accurately apply to my situation. Given their private-party joint participation with the government, the defendants should be considered state actors in this case.

### IV. FOURTH CAUSE OF ACTION

**Defamation-Against Alaska Airlines known and unknown employees.**

166. The allegations set forth in paragraphs above are incorporated by reference as though fully set forth herein.

167. At all relevant times, Defendants were aware of Lora's documented disability pursuant to regulations governing private air carriers engaged in public accommodation. At all relevant times, Defendants were aware of Lora's mask exemption, that made it unhealthy for her to wear a face mask extended periods of time.

168. With recklessness and malice, Defendants intentionally misrepresented and disseminated a false account of Lora's disability/mask exemption and Alaska Airlines lack of accommodation. Under Alaska law, the elements of a defamation claim are:

> (j) a false and defamatory statement;
>
> (2) unprivileged publication to a third party;
>
> (3) fault amounting at least to negligence: and
>
> (4) either per se actionability or special damages. See
>
> State v. Carpenter, 171 P.3d 41, 51 (Alaska 2007).
>
> "Actual malice exists when it is proved that the
>
> defamatory statement was made with knowledge that it
>
> was false or with a reckless disregard of whether it was

false or not." Olivetti City & Borough of Juneau, 171 P.3d

1137, 1143 (Alaska 2007),

169. As a direct result of the Defendants' deliberate omissions and misrepresentations, which were described in the fact section, the media was presented with and subsequently broadcasted a misleading narrative, thereby defaming Lora.

170. Defendants knowingly made false and defamatory statements about Lora to the media and social media. They intentionally and maliciously misrepresented and disseminated a false account regarding Lora's disability, her inability to safely wear a face mask, and their associated lack of accommodation.

171. Due to the wide dissemination of this distorted and false narrative, discussed above, Lora faced considerable harm, including receiving hateful electronic correspondence, distressing phone calls, and a deluge of negative commentary on social media platforms, please read attached exhibits.

172. On numerous occasions, while in areas of the airport under Defendants' control, they behaved aggressively towards Lora, which includes raising their voices and making unreasonable demands, in front of other

passengers. This behavior, whether individual or orchestrated, aimed to provoke and mentally distress Lora.

173. Defendants knowingly made false and defamatory statements as discussed in the fact section, about Lora to the media and social media outlets, please review affidavits submitted in the joinder motions as well and the exhibits attached. Defendants intentionally and maliciously misrepresented and disseminated a false account regarding Lora's disability, her inability to safely wear a face mask, and their associated lack of accommodation.

174. The collective actions of all Defendants caused Lora substantial physical, psychological, and emotional distress, knowing that she was being maliciously defamed. The severe emotional toll and fear the ban could be repeated in future years, rendered it nearly impossible for Lora to continue serving as an elected official in the future.

175. The long travel demands, unprecedented ongoing negative media attention, the chill with her constituents due to the false headlines, and the isolation in Juneau made it nearly impossible for Lora to be able to continue to serve her constituents in the future which led to significant financial repercussions, and disrupted Lora's future retirement plans. The

unfortunate events snowballed, due to the misrepresentation of the
situation made by Alaska Airline employees to various media and social
media outlets.

176.  The widespread negative media attention, including search engine results
referencing Lora's ban from Alaska Air, further amplified the harm, causing
significant emotional distress and defaming Lora's character. Public
statements made by various parties, including Governor Dunleavy and
Alaska Airlines employee Tim Thompson and others, further aggravated
the perception of Lora's actions and led to misconceptions in the public
sphere, causing undue harm and distress to Lora. (exhibit O -CNN 4-27-21)

177.  The obstacles and hardships faced by Lora resulted in significant physical,
mental, and emotional turmoil. Defendants had a clear obligation to
recognize and accommodate Lora's disability and to act in line with all
relevant laws and guidelines. Their failure to do so, particularly the
extensive ban imposed on Lora by Alaska Airlines, severely hampered her
ability to discharge her legislative duties and exposed her to undue
hardship. By their negligence, the Defendants inflicted considerable harm
on Lora, compromising her well-being, and forcing her to confront
heightened risks during her extended travels.

178. Considering the aforementioned facts, I demand that the defendants acknowledge the gravity of their actions, recognize the violations committed, and undertake immediate remedial measures to acknowledge and address the harm caused by their conduct.

179. It affected me deeply. I couldn't concentrate properly on my duties as a legislator. I was flooded with emails, letters, and phone calls that were cruel and hateful. They were based on lies and misinformation. The situation took a considerable toll on me, both personally and emotionally. I felt helpless as I was continuously subjected to cruel treatment. I want to make it clear it was Nona Dimond (exhibit P) who filmed the incident and created an untrue narrative, that was sent to the Alaska Landmine. I hope that I will never have to go through such an experience again.(exhibit Q)

180. I have clearly identified instances where false and defamatory statements were published and disseminated by the defendants, causing harm to my reputation and emotional distress, particularly Troy Michael Wuyts-Smith and Tim Thompson. Please review the affidavits submitted as well. Defendants argue that under Alaska law, a defamation claim requires the elements of a false and defamatory statement, unprivileged publication, fault amounting to negligence, and either per se accountability or special

damages. Defendants further contend that, as a public figure, I must prove actual malice. I have sufficiently plead this these elements in the FAC and joinder affidavits, as the defendants made false and defamatory statements, published them to third parties without privilege, and acted with negligence intentionally damaging my reputation. As a public figure, I am prepared to demonstrate defendants acted with malice, because defendants knew or should have known its statements were false. The evidence (see exhibit 7 in the FAC video or exhibit E attached) demonstrates their narrative was false.

181. In addition, using a search engine to research "State Senator gets banned on Alaska Airlines" you will find tens of thousands of negative references in local, state, national and international media that was based on misleading narrative the defendants provided to the media outlets. (Exhibit  R )

## V. FIFTH CAUSE OF ACTION

### Negligence
### Against all Defendants

182. The allegations set forth in paragraphs above are hereby incorporated by reference as if fully set forth herein.

183. Negligence per se: Defendants had a clear duty and obligation to recognize and accommodate Lora's disability, and to act in line with all

relevant laws and guidelines. Their failure to do so constituted negligence per se on their part.

184.   Their failure to do so, particularly the extensive ban imposed on Lora by Alaska Air, had the direct result of severely hampering Lora's ability to discharge her legislative duties, and exposed her to undue hardship. By their negligence, the Defendants inflicted considerable harm on Lora, compromising her well-being, and forcing her to confront heightened risks during her extended travels.

185.   Defendants, acting in concert, willfully and repeatedly denied Lora her necessary accommodations in contravention of the federal and state guidelines, statutes, and rules previously mentioned.

186.   <u>Negligence- failure to adequately hire, train and retain employees:</u> Notably, Alaska Air has an inherent responsibility to inform and train its employees regarding pertinent state and federal laws. See the New Horizon's US Dept of Transportation requirement for training employees how to serve passengers with Disabilities on page 11.(exhibit S) However, the employees were completely ignorant of the applicable laws, and even of Alaska Air's own policies, when Lora inquired by phone and in person.

Case 3:23-cv-00087-JMK   Document 49   Filed 09/20/23   Page 64 of 107

187. Defendants' employees and supervisors obviously had not been adequately trained. Introduction of new policies or guidelines does not absolve them from adhering to pre-existing laws. Alaska Air engaged in negligence by failing to adequately train, and even inform, its employees of their duties.

188. <u>Negligence by Misrepresentation</u>: The failure of Alaska Airlines to post on its website its real mask exemption policy, and the failure of the agent to correctly convey it to you when you called or asked in person, leading you to believe that your medical exemption would be sufficient, and would be accepted.

189. Also failing to state on its website that a medical release had to be submitted days in advance, for review by the airline's doctor. Also failing to notify Lora, or anyone, by failing to post on its website, or when asked in person, that the airline had a 3-day maximum negative PCR test policy, and that one had to bring the test to the airport for boarding.

190. By its "no exceptions" masking policy, and its failure to provide meaningful accommodations to Lora, as required by the ACAA, the CDC, TSA directive and others, Alaska Air was clearly in violation of the state and federal mandates to accommodate specific exemptions, that were clearly

enumerated in the CDC Mask Order of 1/29/2021, the Office of Aviation Consumer Protection (OACP) Notice of Enforcement of 2/5/2021, the TSA Security Directive of CC/EE/2021, the ACAA itself, at 49 USC 41705, and its implementing regulations at 14 CFR Part 382, and the statewide Order issued by Governor Dunleavy. See the OACP Notice, page 4-5, for a concise summary of the requirements.

191. Violation of a duty mandated by federal, or state statutes, regulations and agency rules is negligence per se. The specific employees who violated the ACAA and other statutory mandates are liable for damages arising from the tort of negligence, which will be determined in discovery.

192. The egregious nature of their actions is inherently outrageous, raising the crucial question: By what authority may such actions be deemed justified? Defendants have likely violated 18 USC 241, engaging in unlawful conduct.

193. The consequences of Defendants' actions have been severe and have caused immense harm to me. I found myself stranded in Juneau during a pivotal legislative session with no means of returning home, even in emergencies. The alternate routes forced me to navigate potentially hostile territories tainted by the Defendants' alleged defamatory actions, resulting in intense scrutiny and a long back room interrogation at the

Canadian border. These alternative routes were rife with risks, as my husband and I were compelled to undertake perilous journeys through treacherous and often unmaintained roads, particularly during the harsh Northern winter.

194. The obstacles and hardships I endured resulted in significant physical, mental, and emotional turmoil. It was the duty of the Defendants to recognize and accommodate my mask exemption in accordance with all relevant laws and guidelines. However, their failure to do so, and particularly the extensive ban imposed on me by Alaska Airlines, hindered my ability to fulfill my legislative duties and subjected me to undue hardship. Due to the Defendants' negligence, I endured considerable harm, undermining my well-being and forcing me to confront heightened risks during my extended travels.

## VI. SIXTH CAUSE OF ACTION

### Constitutional Violations: Article IV, Section 2, and the First, Fifth, and Fourteenth Amendments of the United States Constitution (Against Alaska Airlines)

195. The allegations set forth in paragraphs above are incorporated herein by reference as if fully set forth herein.

196. I assert that Alaska Airlines has violated my constitutional rights protected by the Fifth, First, and Fourteenth Amendments of the United States Constitution. Through their actions, Alaska Airlines has disregarded fundamental constitutional principles.

197. Article IV, Section 2 of the United States Constitution guarantees all citizens the "Privileges and Immunities of Citizens in the several States." The First Amendment protects the rights of free speech, the right to travel and to peaceably assemble. The Fifth amendment, applied to the state and state actors thru the Fourteenth Amendment, ensures that no citizen shall be deprived of life, liberty, or property, without due process.

198. The "No Fly List" typically consists of known or suspected terrorists, or those people who have committed serious crimes on an aircraft. The ban and inability to fly that the Defendants flouted in the media, created serious concerns about Lora in the public square. Citizens, wanted to know what egregious actions resulted in Lora getting a long-term travel ban? To this day, there is misconceptions on what happened, and the chill is still in the air, in her home district around what the Defendants portrayed about the flight ban.

199. Others are disappointed Senator Reinbold no longer represent them in the legislature. Lora lets them know, the long-term flight ban heavily contributed to her decision to not continue serving. Sadly, the ban has negatively impacted numerous relationships, even friends and family members on the East coast and around the US were aware of the unwarranted ban, because of the media sensation Defendants created.

200. Defendant Alaska Airlines placed Lora on a "No Fly List," effectively banning her from traveling on its aircraft. Lora contends that she was placed inappropriately on the No-Fly list without being provided due process, including a complete denial of notice about the real policies of Alaska Airlines, and no provisions for hearing nor any avenue for appeal. It is believed Alaska Airlines had no such procedure in place for the nearly 2000 guests they banned, during the pandemic.

201. Even the federal "No-Fly List," otherwise known as the "Terrorist Watch list," upholds citizens' due process rights by providing a process to appeal one's placement on such a restrictive list.

202. Lora was also concerned that the fly list may be extended to all airlines, creating even more hardship because of rumblings in the media that some

airlines wanted anyone on a no-fly list to be banned on all commercial airlines.

203. According to USA today on April 20, 2022, an article written by Eve Chen. Alaska Airlines will also give some of its grounded guests, the green light. The airline banned more than 1,700 guests over mask violations during the pandemic. "Now that the mask policy has been overturned, guests who were banned solely for mask noncompliance will be allowed to purchase tickets on our flights," Alaska said in a statement to media relations manager Cailee Olson. "However, some guests whose behavior was particularly egregious will remain banned." Some commented on social, which may have been the Blue Alaskan, even after the mask mandate was lifted, questioned if Lora's behavior was so egregious her flight ban would be continued?

204. The ban imposed by Alaska Airlines substantially interfered with Lora's First Amendment rights and rights secured under the privileges and immunities clause of the Constitution, namely her rights to travel, and ability to communicate, and to peaceably assemble with her constituents in her district during session. Lawmakers often fly home on the weekends during session, which was not possible for Senator Lora Reinbold. Lora was

denied this opportunity repeatedly, due to the travel ban imposed by the only airline that provided service between Anchorage and Juneau.

205.  The imposition of a mask mandate, without an exception or accommodation for Lora's circumstances, could be viewed as "compelled speech" which is an infringement on her First Amendment rights by requiring her to act in public, with the inference, that a paper mask can prevent the transmission of a virus, yet the mask manufacturer states on their mask box, admits mask can't (exhibit T). There are strong legal protections prohibiting compelled speech, to be discussed in later pleadings.

206.  The Fourteenth Amendment assures equal protection under the law and reiterates the guarantee of due process. Lora  was denied these protections, when she was banned from flying without sufficient cause or process. Alaska Airlines has acted with impunity denying nearly 2000 people access to public transportation, without extending even the bare minimum of due process, the right to schedule a hearing, and the right to present evidence in support of one's defense.

207.  The Fourteenth amendment also reiterates the guarantee of due process, when state actors are involved (or private parties acting in the capacity of

state actors). Lora was denied these protections when she was banned without sufficient cause or due process. These acts of banning were arbitrary and capricious and are a systemic violation of Lora's due process and equal protection rights. Sara Gamache posted about being politically targeted by Alaska Airlines because she was wearing a pro Trump mask. Both she and her husband, who was silent during the ordeal, got kicked off the plane. Sara's video got millions of views on social media.

208. Given the importance of air travel for Lora's official duties, and the limited and unreliable alternative options available for travel to the State Capital, Alaska Air should have exercised far greater caution, and prudence, and provided a transparent process for redress, before imposing such a restrictive and harsh ban on an elected official.

209. Especially given the monopoly status of Alaska Air in providing public carrier transportation to Juneau, Alaska Air has a heightened duty to avoid restraint of trade under the Sherman Antitrust Act and the Clayton Act. (Rumsfeld v Forum for Academic and Institutional Rights, 547 U.S. 47 (2006).

210. It is noteworthy that Alaska Airlines received almost a billion dollars, from COVID Relief package in one year, raising questions if the covid

money Alaska Air received, influenced their mitigation policies which violated individual liberties and constitutional rights.

## VII. SEVENTH CAUSE OF ACTION

## Violation of Informed Consent 21 U.S.C. §§ 360bbb-3(e)(1)(A)(ii)(III) & AS § 47.30.837

## (Against All Defendants)

211. The allegations contained in paragraphs above are hereby incorporated by reference as if fully set forth herein. Consequently, I assert this Cause of Action, seeking relief for the violation of my informed consent rights under 21 U.S.C. §§ 360bbb-3(e)(1)(A)(ii)(III) and AS § 47.30.837.

212. Alaska Airlines was enforcing EUA PCR test requirements, paper or cloth masks, which research has shown were ineffective. The Covid "vaccinations" were required for their pilots, however federal law prohibits mandates for products under EUA (Emergency Use Authorization). In addition, as required by law, Alaska Airlines denied informed consent. Passengers can legally say no to the medical interventions according to state law. State and federal law protect medical freedom and require informed

consent. Defendants are of state actors forcing products that are
authorized only for emergency use and require informed
consent.

213.  I (and the public at large should) assert a strong claim for the violation of
informed consent rights under 21 U.S.C. §§ 360bbb-3(e)(1)(A)(ii)(III) and AS
§ 47.30.837 against all defendants. These federal and state statutes clearly
establish the requirement for medical interventions to be carried out with
informed consent, respecting my right to receive comprehensive
information about diagnosis, prognosis, potential risks, benefits, side
effects, and available alternative treatments.

214.  In this case, the defendants-imposed mandates on masks and PCR tests
without providing me with the necessary information to make an informed
choice about my medical decisions. They failed to disclose crucial details,
including the efficacy of masks, accuracy of PCR tests, potential risks
associated with these measures, and alternative options. As a result, I was
deprived of my right to make informed decisions regarding my own health.

215.  Alaska Airlines' failure to meet the legal standards for informed consent,
exhibited a disregard for my autonomy and infringed on my right to make

Case 3:23-cv-00087-JMK   Document 49   Filed 09/20/23   Page 74 of 107

medical decisions, based on informed choices. This coercion led to my

compliance with the mandates without my fully understanding the

potential consequences and alternatives available to me. Such actions

clearly violate both federal and state laws governing informed consent.

216. Informed consent for medical interventions requires specific disclosures

to the patient. These include but are not limited to diagnosis and prognosis

of the patient's illness; a detailed description of the recommended

procedure or treatment; potential outcomes of the procedure or

treatment; probable risks, side effects, potential benefits, and possible

complications, information about alternative treatments and the

implications of non-treatment. See Canterbury v. Spence, 464 F.2d 772,

786-87 (D.C. Cir. 1972).

217. The Federal Food, Drug, and Cosmetic Act mandates that recipients of

medical products authorized for emergency use are informed of the

benefits and risks of such products, and of the option to accept or refuse

the product. 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III).

218. Alaska's informed consent laws further emphasize the requirement for

clear communication about medical procedures, ensuring patients' rights

to information and decision-making. AS § 47.30.837. Lora was thereby

subjected to coercion in violation of AS § 11.41.530, by feeling compelled to comply with mandates without proper informed consent.

219. By mandating masks and PCR tests without offering adequate information and choice, the Defendants contravened the aforementioned federal and state informed consent statutes. In addition, Alaska Airlines required their pilots and employees, illegally, to get the Covid Vaccine, which was under EUA authorization.

220. Deep concerns have risen due to the lack of efficacy and heighten side effects including strokes, heart attacks, neurological problems and even death. Alaska Airlines covid vaccine requirement in particular for pilots, has put the health and safety of passengers at an increased risk, due to the high number of adverse reactions to these vaccines.

## VIII. EIGHTH CAUSE OF ACTION

### Breach of Contract

### (Against Alaska Airlines)

221. The allegations contained in paragraphs above are hereby incorporated by reference as if fully set forth herein.

222. At all times relevant herein, Defendant a had Contract of Carriage with Lora, which was further supplemented by benefits and terms granted to MVP Gold Status members.

223. Alaska Airlines' Contract of Carriage explicitly if it was subject to applicable laws, regulations, and rules imposed by U.S. and foreign governmental agencies. In the event of a conflict, these laws, regulations, or rules would prevail.

224. Lora purchased a round trip ticket to and from Juneau for her the weekend of April 23, 2021, returning for session on Monday April 26th. Unbelievably, the ticket for travel with Alaska Airlines for her return to Juneau was unilaterally and abruptly cancelled without sufficient justification or prior notice, Alaska Airlines unilaterally cancelled the ticket and even removed it from Lora's Ak Air app, thereby breaching the terms of the Contract of Carriage.

225. Further, when Alaska Airlines not only banned Lora from Alaska Airlines flights indefinitely, but they also failed to honor the benefits and privileges afforded to Lora under her MVP Gold Status membership, which is part of the Contract of Carriage. Alaska Airlines did not extend the MVP benefits

Lora had earned when she was able to resume flying with them, when the mask mandate was struck down in district court.

226. Despite representing in the Code of Ethics of Alaska Airlines commitment to treating all guests with respect and kindness, Alaska Airlines' actions several times were totally inconsistent with the Ethics code and broke this commitment toward Lora. Defendants were willful and intentionally discriminatory, as described in the first amended complaint.

227. As a direct and proximate result of Alaska Airlines' breaches, Lora suffered damages, including but not limited to the loss of travel, denial of contractual benefits, and consequential damages related to her ability to perform legislative duties.

## IX. NINTH CAUSE OF ACTION

## Breach Of Contract Arising from Common Carrier Obligations

## (Against Alaska Airlines)

228. The allegations contained in paragraphs above are hereby incorporated by reference as if fully set forth herein.

229. My claim centers on the defendant's failure to provide a service that is required by federal regulations the defendants engaged in negligence, defamation, IIED all of which are clear violations of common carrier duties.

230.  I assert a strong claim against Alaska Airlines for breach of contract arising from their obligations as a common carrier. Alaska Airlines operates as a common carrier, providing transportation services to the public, including myself, for a fee.

231.  Common carriers, such as Alaska Airlines, are held to a heightened duty of care. They are legally and contractually obligated to ensure the safety and well-being of their passengers and to transport them to their destinations without harm or undue distress.

232.  In this case, Alaska Airlines breached its duty of care as a common carrier by canceling my ticket back to the legislative session, without adequate notice or nor justification. Additionally, the airline failed to honor the terms of the Contract of Carriage and the privileges afforded to me under my MVP Gold Status membership. These actions constitute a clear violation of their obligations both legally and under the contract.

233.  I placed my trust in Alaska Airlines, relying on their representations and contractual promises, expecting them to fulfill their obligations as a common carrier and provide the agreed-upon services.

234.  As a direct result of Alaska Airlines' breach of their obligations and duty of care, I suffered damages, including emotional distress and major

inconvenience. Furthermore, the breach of contract hindered my ability to fully attend to my official legislative duties.

235.  The travel hardships created by Alaska Airlines' ban, along with subsequent leaks to the media and resulting negative media attention, caused further hardships and required a significant amount of time addressing the situation. The inability to return to my district for important constituent meetings during legislative regular and special sessions significantly diminished my effectiveness as an elected official.

236.  Thus, I assert this Cause of Action, seeking appropriate relief for the breach of contract committed by Alaska Airlines because of their violation of common carrier obligations.

237.  Furthermore, I believe that the defendants are not immune from liability simply because airline employees were not parties to any agreements with me. Alaska Airlines as the employer certainly are responsible for enforcing policies that comply with the terms of the contract, and as such, they should be held accountable.

## X. TENTH CAUSE OF ACTION

### Interference With Official Duties Under the Guarantees Clause

### (Against All Defendants)

238. The allegations set forth in paragraphs above are incorporated by reference as though fully set forth herein.

239. The foundation of representative government in the United States, as enshrined in the Constitution, rests on the principle that elected officials should be free to execute their responsibilities without undue interference. This right is not only vital for the official but is paramount to the rights of the constituents they represent.

240. The Guarantees Clause of Article IV, Section 4 of the U.S. Constitution mandates that the United States ensure that every state maintains a "republican" form of government. This form of government is defined by its representative nature, where elected officials act on behalf of their constituents. See Kerr v. Hickenlooper, 759 F.3d 1186, 1194 (10th Cir. 2014).

241. Interference with an elected official's ability to perform his or her duties directly undermines the principles of this republican form of government, effectively eroding the representative relationship foundational to our constitutional system.

242. Lora, as a duly elected representative and Senator for District G in the Alaska State Senate, held constitutional obligations and duties to represent

the interests and welfare of nearly 40,000 constituents. This representation required regular attendance in Juneau, Alaska, for legislative functions, which were constitutionally mandated.

243. Defendants were aware, or reasonably should have been aware, of Lora's official status and the essential nature of her travel between Anchorage and Juneau to discharge her official legislative duties.

244. Despite this knowledge, Defendants, through their collective actions and omissions, intentionally or negligently created barriers to Lora's timely and efficient travel between Anchorage and Juneau, thereby interfering with her ability to perform her legislative duties.

245. Specifically, Alaska Airlines' ban, imposed without proper investigation or due process, directly prevented Lora from accessing the primary means of transportation between the two cities. The resulting alternative routes that Lora was forced to take not only significantly extended her travel time, but it also significantly increased her safety risk due to driving extensively in harsh conditions, and subjected her to undue public scrutiny, and widespread negative media attention.

246. Shockingly, it was reported to CNN that an FAA was looking into the incident where an Alaska Senator got banned. (Tim Thompson's)

misleading narrative led to additional ridicule. (See exhibit O, ref: CNN article on April 27, 2021)

247. The actions and inactions of the Defendants, collectively and individually, hindered and interfered with Lora's performance of her legislative duties, causing harm not only to Lora, but also to her constituents who relied upon her representation. Such actions by Alaska Airline and its employees interfered with the Guarantees Clause of our Constitution.

## XI. ELEVENTH CAUSE OF ACTION

## Intentional Infliction of Emotional Distress

## (Against Alaska Airlines and known & unknown employees)

248. The consequences of Defendants' actions have been severe and have caused immense harm to me. I found myself stranded in Juneau during a pivotal legislative session with no means of returning home, even in emergencies.

249. The alternate routes I had to take forced me to navigate potentially hostile territories, tainted by the Defendants' alleged defamatory actions, resulting in intense scrutiny at the Canadian border. These alternative routes were rife with risks, as my husband and I were compelled to

undertake perilous journeys through treacherous and often unmaintained roads, particularly during the harsh Northern winter.

250. The obstacles and hardships I endured resulted in significant physical, mental, and emotional turmoil. It was the duty of the Defendants to recognize and accommodate my disability in accordance with all relevant laws and guidelines. However, their failure to do so, particularly the extensive ban imposed on me by Alaska Airlines, severely hindered my ability to fulfill my legislative duties and subjected me to undue hardship. The Defendants' negligence inflicted considerable harm upon me, undermining my well-being and forcing me to confront heightened risks during my extended travels.

251. The deliberate and intentional acts of the Defendants, working in concert to harm me, have caused enormous emotional distress. A review of the numerous and extraordinarily egregious acts committed by the Defendants would lead any reasonable person to understand the magnitude of the harm inflicted upon me.     The deliberate and intentional acts of the Defendants, working in concert to harm me, have caused enormous emotional distress.

252. Under Alaska law, to establish a claim of intentional infliction of emotional distress (IIED), the following elements must be demonstrated:

   a. EXTREME AND OUTRAGEOUS CONDUCT: The Defendants' willful and repeated denial of necessary accommodations, in violation of federal and state guidelines, statutes, and rules, exposed me to needless medical and safety risks. This conduct was extreme and outrageous since it appeared to be driven by an intent to subject me to public ridicule and humiliation, disregarding my qualified mask exemption and violating established laws. Additionally, the targeted confrontational behavior demonstrated by the incident on April 22, 2021, involving Alaska Air personnel and TSA, lacked justification and caused significant emotional distress and embarrassment.

   b. INTENTIONAL OR RECKLESS CONDUCT: The Defendants' actions were intentional and reckless. They deliberately denied me accommodations and raised their voices at me in public. Moreover, their decision to ban me indefinitely from flying on Alaska Airlines, without any means of appeal, demonstrates their intentional infliction of emotional distress.

Case 3:23-cv-00087-JMK   Document 49   Filed 09/20/23   Page 85 of 107

c. SEVERE EMOTIONAL DISTRESS: The Defendants' actions caused severe emotional distress. As a result of their denial of accommodations, I was subjected to perilous journeys through potentially hostile territories, forced separation from my home, and profound physical, mental, and emotional turmoil. The Defendants' deliberate creation of a false narrative and subsequent hate-filled communications further exacerbated my emotional distress.

253. Based on these facts and the legal requirements, it is apparent that the Defendants intentionally and recklessly inflicted severe emotional distress upon me, thus justifying an IIED claim.

254. By willfully and repeatedly denying Lora her necessary and deserved accommodations, in contravention of the clear federal and state guidelines, statutes, and rules previously mentioned, and thereby exposing Lora to needless medical and health safety risks, Defendants inflicted enormous personal emotional distress on Lora.

255. Such denial appeared to be driven by an intent to expose Lora to public ridicule and humiliation, coupled with a total disregard for her qualified mask exemption, in violation of established federal and state laws.

256. By effectively raising their voices at Lora, in public, including in the airport and on the plane in view of the other passengers, Defendants willfully inflicted enormous personal emotional distress on Lora. Especially by engaging in the targeted confrontation on April 22, 2021, when Alaska Air personnel, Troy, guided the TSA lead agent, to hover over what was a pre-planned confrontation by Alaska Airlines supervisor Alison. Discovery will show if there was a conspiracy to deny civil rights to Senator Lora Reinbold.

257. Video tapes mentioned above from April 22, 2021, reveal that there was no reason whatsoever to bring in police, Defendants inflicted enormous personal emotional distress and embarrassment on Lora.

258. By taking the extraordinary step of banning Lora indefinitely from flying on Alaska Airlines, when it was the only carrier providing air services between Anchorage and Juneau, with no way to appeal that arbitrary and unprovoked decision, Defendants inflicted enormous personal emotional distress and hardship on Lora.

259. By deliberately creating a false narrative (with malice) to the media and social media, with the avalanche of hateful and threatening

Case 3:23-cv-00087-JMK   Document 49   Filed 09/20/23   Page 87 of 107

communications that followed due to their deliberate misrepresentation of the situation and of Lora's medical disability, Defendants inflicted enormous personal emotional distress on Lora.

260.  The ramifications of the Defendants' actions had severe consequences for Lora.  They went far beyond the trifling mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities, that cannot form the basis of an IIED claim.  (exhibit U)

261.  Lora found herself stranded in Juneau during a pivotal legislative session, with no means to return home, even for any emergencies. Her alternate routes required her to traverse potentially hostile territories, where her reputation had been tainted by the Defendants' defamatory actions, leading to intensive scrutiny at the Canadian border.  The alternate routes were fraught with physical risks and took up to five days to complete the journey. They required Lora and her husband to undertake perilous journeys through treacherous and often unmaintained roads, particularly during the severe Northern winter.

262. The actions of the Defendants appear deliberate and intentional, seemingly executed with the intention of causing as much harm and damage to Lora as possible.

263. The gravity and nature of such actions can be characterized as inherently outrageous. By no authority may such actions be deemed justified. The obstacles and hardships faced by Lora resulted in significant physical, mental, and emotional turmoil. It affected important personal and professional relationships.

264. The deliberate and intentional acts of the defendants to harm Lora did in fact create enormous emotion harm, in view of the numerous and extraordinarily egregious acts of defendants, that harmed Lora.

265. Because of the flight ban on the monopoly airline servicing the Anchorage-Juneau route, Lora had to endure hazardous travel conditions, including a 750-mile drive in severe weather and confrontational interactions and back-room interrogation at the Canadian border. Defendants should have foreseen the repercussions of their actions and should be penalized to dissuade them from causing such harm to others in the future.

266. The ban led to sustained intentional infliction of emotional distress, magnified by widespread worldwide negative media coverage on numerous global platforms and major national news media outlets and abroad.

## XII. TWELFTH CAUSE OF ACTION

### Invasion of Privacy

### (Against Alaska Airlines, known and unknown employees)

267. Alaska Const. Article 1, Section 22 provides strong privacy protections to citizens. By mistreating and humiliating Lora in public, at the airport and on the plane, Alaska Air and its employees clearly violated that Constitutional protection. By leaking misleading information to the media and social media, Alaska Air and its employees clearly breached that duty to respect Lora's privacy.

268. I am deeply disappointed that Alaska Airlines chose to release public statements based on a misleading narrative about me, which resulted in the publication of numerous false stories. What's even more concerning is that the defendant used my name in national media without my knowledge or consent. This has led to a narrative that has subjected me to

Case 3:23-cv-00087-JMK   Document 49   Filed 09/20/23   Page 90 of 107

significant humiliation and scrutiny, not just locally but also nationally and internationally.

269. I, as Lora, assert that my rights to privacy, protected under Alaska Constitution in Article 1, Section 22, were gravely violated by Alaska Airlines and its unknown employees. Their egregious conduct of mistreating and humiliating me in public, both at the airport and on the plane, is a clear infringement upon my constitutional protection.

270. Additionally, the intentional dissemination of false information to the media and social media platforms by Alaska Airlines and its employees further breaches their duty to respect my privacy. These actions have caused significant harm to my reputation and well-being, warranting legal action to hold the Defendants accountable for their violation to my constitutional right to privacy.

## XIII THIRTEENTH CAUSE OF ACTION

## BREACH OF IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING

### (Against Alaska Airlines)

271. Lora had a reasonable expectation that Alaska Airline would act honestly, and in good faith in its interactions with her. Alaska Air had an obligation to deal fairly with all its guests, including Lora. This cause of action relates

to Defendant Lora on the no-fly list without cause or remedy and leaking false and/or misleading information to the press.

272. Alaska Air clearly breached that covenant, by putting Lora on the no-fly list without cause or remedy, and then leaking false information to the press, about Lora and the events that had transpired in the airport and on the plane.

273. In addition, forcing Lora to take long and dangerous drives to reach Juneau, due to Alaska Airline's arbitrary inclusion of Lora on its No-Fly list for nearly a year, clearly breached its duty to operate in good faith and fair dealings.

274. Alaska Airlines and its unknown employees placed me on the no-fly list, without any justifiable cause or opportunity for remedy. This arbitrary decision not only violates my rights as a passenger but also constitutes a breach of the implied covenant of good faith and fair dealing between me and Alaska Airlines. By unilaterally acting without providing me with due process or the ability to challenge my inclusion on the no-fly list, Alaska Airlines and its unknown employees have clearly violated their contractual obligations. This breach has resulted in significant damage to my reputation, livelihood, and my freedom to travel. Moreover, the

intentional leaking of false information to the press by the Defendants

exacerbates their breach of the implied covenant of good faith and fair

dealing. To rectify these violations and seek justice, legal intervention is

necessary to hold the Defendants accountable for their actions.

## XIV. FOURTHTEENTH CAUSE OF ACTION

## CONSTITUTIONAL EQUAL PROTECTION VIOLATIONS

### Against Alaska Airlines

275. At the same time that Alaska Airline was discriminating against Lora for

allegedly not wearing her mask high enough, an Alaska Airline employee,

on the same plane, walked around with their masks below their nose.

(exhibit to be provided at discovery, along with several other "non-

complaint" photos of employees and others). Such unequal treatment, and

blatant hypocrisy, is a clear violation of Lora's equal Protection rights

secured by the Constitution.

276.  As the Plaintiff, I firmly assert that Alaska Airlines and its unknown

employees, have violated my constitutional right to equal protection under

the law. The evidence clearly shows airline personnel and others wearing

masks improperly masks or no masks at all. Their enforcement of disparate

treatment towards me, denial of my qualified mask exemption, and

subjecting me to humiliating confrontations, directly undermine my constitutional right to equal protection. These actions demonstrate a blatant departure from the constitutional standards of fairness and equality. To ensure my rights are vindicated and the importance of equal protection is upheld, legal action is imperative.

## XV. FIFTEENTH Violation to the Constitutional Right to Travel
### Against Alaska Airlines & the unnamed defendants on the committee that oversaw the banning passengers for mask noncompliance

277. Alaska Airlines' initial flight ban and illegitimate extended ban, determined by the mysterious committee, in particular without any legitimate due process, clearly violated Senator Lora Reinbold's Constitutional Right to Travel. Defendants had a heightened duty to ensure guaranteed rights were not violated due to her constitutional responsibility to be in Juneau, Alaska State Capital to tend to her mandated constitutional duties. In addition, there is a DOT "Airlines Passengers Bill of Rights" that Air Carriers are required to abide by. (Exhibit V)

278. Alaska Airlines is keenly aware they are the only commercial carrier providing public transportation between Anchorage and the State Capital of Juneau, during legislative session. Due to this monopoly, they had a

heightened duty protect constitutional rights of all passengers, in particular those with a constitutional duty to be in Juneau, such as Lora. The cases below show the right to travel is clearly established and a guaranteed right.

279. Eggert v. City of Seattle: "the recognition of the importance of freedom of movement ranges from the declaration in the Magna Charta allowing every free man to leave England except during wars, to article 13, section 1 of the University Declaration of Human Rights of the United Nations which declares 'Everyone has the right to freedom of movement and residence within the borders of each State.'

280. "Perhaps the earliest enunciation of the right to travel was in Corfield v. Coryell, 6 Fed.Cas. p. 546 (No. 3,230) (C.C.E.D.Pa.1823). There Justice Washington, enumerating those rights he felt to be fundamental, noted at page 552:

281. "The right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise . . . may be mentioned as (one) of the particular privileges and immunities of citizens, which are clearly embraced by the general description of privileges deemed to be fundamental.

282. "In the Passenger Cases, 48 U.S. (7 How.) 283, 492, 12 L.Ed. 702 (1849), Chief Justice Taney, in a dissent, commented that freedom to travel is an incident of national citizenship. This dissent is quoted with approval in Crandall v. Nevada, 73 U.S. (6 Wall.) 35,18 L.Ed. 744 (1867), where the United States Supreme Court based the right to travel upon a constitutional requirement that all citizens have free access to the seats of government.

283. "Modern development of the doctrine began with Edwards v. California, 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119 (1941), where the court held a law denying assistance to nonresident indigents entering the state was an impermissible burden on interstate commerce. A concurring opinion by Mr. Justice Douglas attributed the source of the right to travel as 'an incident of National citizenship' and was an implied right 'fundamental to the national character of our federal government.' A second concurring opinion by Mr. Justice Jackson, assigned the source of the right to the privileges and immunities clause of the Fourteenth Amendment.

284. "Kent v. Dulles, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958), the due process clause of the Fifth Amendment was cited as a source of the right to travel. The court, in dictum, recognized 'Freedom of movement across frontiers in either direction, or inside frontiers as well, was a part of our

Case 3:23-cv-00087-JMK   Document 49   Filed 09/20/23   Page 96 of 107

heritage.' The same source for the right was cited by the court in Aptheker v. Secretary of State, 378 U.S. 500, 517, 84 S.Ct. 1659, 1669, 12 L.Ed.2d 992 (1964), where the court premised its decision on the right to travel. Freedom of travel was stated to be a liberty guaranteed by the Fifth Amendment and, as well, 'a constitutional liberty closely related to rights of free speech and association . . .'[1]

285. "The right to travel was given further scope in United States v. Guest, 383 U.S. 745, 757, 86 S.Ct. 1170, 1178, 16 L.Ed.2d 239 (1966), where the court expanded its protection to incidents involving private individuals. The majority noted:

286. "The constitutional right to travel from one State to another . . . occupies a position fundamental to the concept of our Federal Union. It is a right that has been firmly established and repeatedly recognized. ..

287. "Although there have been recurring differences in emphasis within the Court as to the source of the constitutional right of interstate travel, there is no need here to canvass those differences further. All have agreed that the right exists.

288. "Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), adhered to Guest in declining to ascribe the right to travel to any particular

Case 3:23-cv-00087-JMK   Document 49   Filed 09/20/23   Page 97 of 107

provision of the constitution. The court did, however, at one point apply an equal protection analysis, finding infringement of a fundamental right of interstate movement and requiring a showing of a compelling state interest to justify the infringement. In another part of the opinion, the court rejected a rational relationship argument by the state and held, whereby traveling the parties were exercising a constitutional right, 'any classification which serves to penalize the exercise of that right, unless shown to be necessary to promote a Compelling governmental interest, is unconstitutional.'

289. "In Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), the court again recognized the status of the right to travel as a fundamental right protected by the equal protection clause of the Fourteenth Amendment where it stated, 'The constitutional question presented is whether the Equal Protection Clause of the Fourteenth Amendment permits a State to discriminate in this way among its citizens.' The protection of the right by the constitution itself is also recognized by the majority in Dunn, where citing Justice Stewart's concurring opinion in Shapiro, it noted 'The right to travel is 'an Unconditional personal right,' a right whose exercise may not be conditioned.' Justice Stewart had, in Shapiro, emphasized that travel is an established constitutional right, not a mere conditional liberty

Case 3:23-cv-00087-JMK   Document 49   Filed 09/20/23   Page 98 of 107

subject to regulation and control under conditional due process or equal protection standards.

290. "The right to travel is a right applicable to intrastate as well as interstate commerce. Inasmuch as the right to travel is not based on the commerce clause, it does not depend on the interstate nature of travel. King v. New Rochelle Municipal Housing Authority, 314 F.Supp. 427 (S.D.N.Y.1970); Karp v. Collins, 310 F.Supp. 627, 634 (D.N.J.1970). Rights, such as the right to travel, which involve personal liberty are not dependent on state lines. Both travel within and between states is protected.

291. "In United States v. Guest, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966), the court held that the right to travel can be protected from interference by private individuals as well as by state and federal governments."

## XVI. SIXTEENTH CAUSE OF ACTION: VIOLATION OF FIDUCIARY RESPONSIBILITY TO SHAREHOLDERS (AGAINST ALASKA AIRLINES)

292. It is evident that Alaska Airlines and its unknown employees have failed to fulfill their fiduciary duty, to act in the best interest of their shareholders. Through their misconduct and actions that have sparked public

controversy, mistreated me, and leaked false information to the media, the Defendants have severely damaged the reputation and value of Alaska Airlines.

293. This breach directly contravenes their fiduciary responsibility to shareholders, which mandates safeguarding and enhancing the reputation, integrity, and shareholder investments within the company. The Defendants' disregard for this duty has resulted in financial harm to shareholders and a loss of trust in the company. Legal action is necessary to address this breach and protect the interests of shareholders.

294. Unfortunately, Alaska Airlines banned nearly 2000 passengers for mask noncompliance. Ultimately that mask mandate was found unlawful. By negatively impacting so many passengers, Alaska Airlines failed their fiduciary responsibility to act in the best interest of their shareholders. Alaska Airlines "No More Medical Exemptions" also disenfranchised passengers with Disabilities. (exhibit W)

295. In addition, Alaska Airlines has created significant liability and increased public health risks, by requiring their pilots to take the EUA Covid shots. Defendants covid vaccine requirement violated existing international, national and state laws. The covid shots have significantly increased health

risks to the pilots and thus the increased the public safety risk to the passengers that fly on Alaska Airlines. (research and expert testimony to be provided upon discovery).

296. In addition, some travelers are weary of flying. The public is aware your pilots were required, illegitimately, to take covid shots, that had higher risks and to be used only under emergency use authorization. Concerned passengers, weary the covid vaccine side effects, particularly to the pilots, may reduce their travel on your airline, in order to reduce their public safety risk. This will reduce revenue to the airline, ultimately and negatively impacting shareholder value.

## Conclusion

297. To deny anyone, let alone an elected official, who was required to be in Juneau, the ability to fly on the only airline servicing our Capital, during legislative session, is unwarranted. After coercing me to wear a mask, denying my requested medical accommodation, while having a valid medical exemption, the airlines has unequivocally violated my protected rights. I sincerely request the court's utmost consideration adjudicating constitutional infringements and the direct implications they have on the application of the law in this case.

298. Despite what the defendants erroneously claim their policies and actions were not discriminatory, I maintain that Defendants have discriminated against me, violated guaranteed rights, and caused significant harm. Granting the defendant's motion to dismiss would be premature and clearly unjust, considering that further amendment of the pleading ,may be warranted, as additional important evidence emerges during discovery.

299. As the Supreme Court has recognized, pro se litigants are often unfamiliar with the complexities of the legal system and should not be held to the same standard as parties with legal representation.

300. I implore the Court to evaluate the merits asserted against the defendants and that these claims should proceed to a full and fair adjudication. The defendants' continued mischaracterization of my actions and misinterpretation of the facts, surrounding my interactions with Alaska Airlines to the public, necessitate a clear account of the events, to correct the misconceptions.

301. It is crucial to recognize this complaint raises concerns regarding the way the airlines enforced the mask mandate throughout the pandemic, not the mere existence of mitigation strategies themselves. In conclusion, the defendants' continuing efforts to downplay my concerns and misinterpret

the facts, do not invalidate the fundamental issues raised in the complaint.

302. For the interest of Justice, the complaint needs full adjudication by this Court, to address the damage caused to Lora, because of Defendants willful intentional violations to the Constitution, and existing state and federal laws.

303. In conclusion, as the Plaintiff, I assert that Alaska Airlines and its unknown employees have flagrantly violated my rights, breached their legal obligations, and caused significant harm.

304. The invasion of my privacy, breach of the implied covenant of good faith and fair dealing, failure of fiduciary responsibility, and constitutional equal protection violations are compelling causes of action that warrant vigorous legal pursuit.

305. The weight of the evidence and the severity of the Defendants' actions demand a steadfast response to ensure justice is served and my rights are vindicated.

306. Although it is impossible to describe all the pain and difficulties; to rectify all the wrongs; restore all the broken relationships; heal all the pain; and restore the damage to my reputation that was caused by Alaska Airlines actions, my prayer for relief is below:

**PRAYER FOR RELIEF**

307.      WHEREFORE, Lora, in a solemn gesture, implores this honorable

Court to grant the following recompense against each of the named

Defendants. Substantiated by the damages caused by Defendants' actions,

Lora asserts their entitlement to rightful damages, injunctive relief, and

any other measures that the Court deems equitable and fitting.

### I. Declaratory Judgment

308.  Lora requests this esteemed Court to declare the named Defendants

violated her guaranteed Constitutional Rights, in addition to federal and

state statutes identified and unidentified in this amended complaint.

### II. Actual Damages

309.  Lora unequivocally demands restitution in the form of actual damages

imposed upon each individual Defendant, amounting to no less than

$500,000. Such a request finds its basis in the Defendants' deliberate and

willful infringement upon Lora's inalienable rights, anchored firmly in

both the Constitution and the applicable state and federal laws.

### III. Compensatory Damages

310. Lora adamantly asserts their entitlement to compensatory damages, valued at $1,000,000, levied upon every named Defendant. This calculated sum stands representative of the financial burden, pain and suffering, Lora has endured and continues to endure, as a direct result of Defendants' actionable transgressions.

### IV. Punitive Damages

311. In the pursuit of justice and as a stern deterrent against future misconduct, Lora implores this honorable Court to bestow punitive damages upon each named Defendant. A resounding verdict, encapsulating a meaningful sum of $5,000,000, or an alternative magnitude deemed just and fitting by this Court, to conveys a resolute message that flagrant defiance of passengers legal and guaranteed constitutional rights, shall not go unpunished.

### V. Public Apology

312. Lora petitions this esteemed Court to issue an unequivocal order, compelling each named Defendant to deliver published and public apologies. This act, due homage to the gravity of the transgressions committed, shall serve to restore a modicum of the harm to Lora's reputation and help ameliorate the injury inflicted to her.

**VI. Costs and Legal Fees:**

313. Lora requests an award of all incurred costs, including the fees accrued throughout the initiation and adjudicating of this case, including fair reimbursement for her time litigating this matter. It is with a firm conviction that Lora deserves full restitution, encompassing all legitimate expenses borne out of the pursuit of justice.

**VII. Additional Relief**

314. Lastly, Lora urges this Court to exercise its discernment in adjudicating any further relief that it deems befitting within the extreme circumstances at hand. The court's authority shall prevail in administering whatever just and proper measures may be required to rectify the prevailing injustices that have been set forth in the complaint.

Dated this 20th date of September 2023.

*Lora H. Reinbold*

/s/ Lora Reinbold

Plaintiff, Lora H. Reinbold, pro so

## Certificate of Service

I hereby certify that on the 20th day of September 2023
I served a copy of the foregoing via US Mail on the following offices:

Robert L. Richmond, Esq. Akbar No. 7011069
Rebecca Lindemann Akbar No.1309051
Richmond and Quinn APC
360 K Street, Suite 200
Anchorage, AK 99501
Tel 907-276-5727
Email: brichmond@rich.mondquinn.com
        rlindemann@richmondquinn.com

Richard G. Grotch, pro hac vice
Jetstream Legal APC
80 Cabrillo Highway North Suite Q-325
Half Moon Bay, CA 94019
Tel 415-961-1961
Email rgrotch@jetstreamlegal.com

/s/ *Lora Reinbold*

Lora H. Reinbold, Pro Se